## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KISANO TRADE & INVEST       )
LIMITED, and TRASTECO LTD.     )
                                   )
          Plaintiffs,            )
                                   )      Civil Action No.
      v.                      )
                                   )
DEV LEMSTER, and            )
STEEL EQUIPMENT CORP.,       )
                                   )
          Defendants.

## COMPLAINT

Plaintiffs Kisano Trade & Invest Limited ("Kisano") and Trasteco Ltd. ("Trasteco")

complain, as follows:

### INTRODUCTION

1.      Defendants Dev Lemster and his Pittsburgh based company, Steel Equipment

Corporation, were agents of Trasteco and Kisano who abused their position of trust to use

information provided in confidence to collect commissions from secret deals related to Plaintiffs'

business with third-parties from 2004 through 2008 (collectively, the "Illegal Scheme"). As part

of the Illegal Scheme, Defendants committed a pattern of racketeering including the receipt of

secret commissions and payment of bribes to the Israeli business advisor of Trasteco and Kisano

through the wires and mails. Trasteco and Kisano only uncovered the Illegal Scheme through

discovery in litigation involving a third party in 2010.

2.      Kisano and Trasteco seek compensatory damages in excess of $1 million, trebled

in excess of $3 million under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. § 1961 *et seq.*, as well as punitive damages under various state law claims.

## JURISDICTION AND VENUE

3.      Federal question jurisdiction lies pursuant to 28 U.S.C. §1331 and 1337(a) and 18 U.S.C. §1964(c) because this case arises under the laws of the United States based on claims under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

4.      Diversity of citizenship jurisdiction lies pursuant to 28 U.S.C. §1332(a) because Plaintiffs are subjects of foreign states and all Defendants are citizens of Pennsylvania and the amount in question exceeds $100,000.

5.      Venue is proper under 18 U.S.C. §1965 because Defendants are resident and transact their affairs in this District and 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

### PARTIES

#### Plaintiffs

6.      Plaintiff Kisano Trade & Invest Limited ("Kisano") is a corporation organized under the laws of the Republic of Cyprus.

7.      Plaintiff Trasteco, Ltd. ("Trasteco") is a limited liability company organized under the laws of Malta.

8.       Plaintiffs are each a "person" within the meaning of 18 U.S.C. §1961(3) and 1964(c).

9.      George Svishchov ("Svishchov") is a citizen of Ukraine who assisted Trasteco and Kisano in the business dealings at issue.

#### Defendants

10.     Defendant Steel Equipment Corp. ("SEC") is a corporation organized under the laws of Pennsylvania with a principal place of business in Pittsburgh, Pennsylvania.  SEC is

engaged in the business of buying and selling used steel making equipment and providing advisory, appraisal and consulting services.

11.     Defendant Dev Lemster ("Lemster") is a citizen of Pennsylvania.   Lemster is the president and, upon information and belief, the sole owner of SEC.

## FACTS

## BACKGROUND

### The Kansas City Caster Deal

12.     On or about 2000, Lemster was contacted by Akiva Sapir ("Sapir") an Israeli attorney/businessman whoh represented owners of a steel mill in Ukraine, who were looking to upgrade the facility.   At all times relevant hereto, Lemster knew that Sapir was an agent providing advice to Svishchov and his principal.

13.     Thereafter, Lemster advised Svishchov and his principal in purchasing steel making equipment from Kansas City (the "Kansas City Caster"), which was shipped to Ukraine. As a result of the Kansas City Caster project, Lemster became trusted for business advice by Svishchov and his principal.

### The Warren Plant Transaction

14.     In 2001, Lemster assisted Svishchov and his principal in the acquisition of a shuttered steel making facility located in Warren, Ohio (the "Warren Plant") for Ukrainian interests.

15.     In early 2002, Lemster, through SEC, began providing management services to the Warren Plant.   From February 2002 through February 2006, SEC issued monthly invoices for expenses related to the Warren Plant.   In exchange for its services, SEC collected royalties

3

from gas wells located at the Warren Plant.  SEC's compensation for the services provided was
open and fully disclosed to Svishchov and his principal.

## THE FRAUDS

### LEMSTER'S SECRET DEAL RELATED TO TRASTECO

16.     In 2004, Sapir asked Lemster if he could advise a source of coal for shipment to
Ukraine.  Lemster recommended Andy Fry of Winding Gulf, LLC ("WG") based in North
Carolina.  Lemster never requested compensation for this advice from Svishchov or his
principal.

17.     WG proposed selling several hundred thousand tons of coal to Trasteco at $128
per ton, and various other conditions.   Lemster and Sapir assisted Svishchov in negotiating the
terms of the contract with WG.

18.     On December 20, 2004, Trasteco entered into a contract to purchase 120,000
metric tons (plus or minus 10%) of metallurgical coal at $120 per ton, as amended on January 4,
2005, which was divided into two shipments and later increased to additional shipments.

### SEC's Secret Deal with WG

19.     Unbeknownst to Trasteco (Svishchov and his principal), on January 11, 2005 SEC
and WG entered into a secret agreement (the "Trasteco Secret Deal") whereby SEC would be
paid $2 per ton as the "buyer's agent".  Exhibit A.   <u>To repeat, this contract expressly recognized
that SEC was Trasteco's agent.</u>

20.     Upon information and belief, WG increased the prices in the contract to cover the
$2 per ton "buyer's agent" commission.

### WG Pays SEC under The Trasteco Secret Deal

4

21.     On or about February 14, 2005, WG paid SEC $260,000 as its $2 per ton commission on 130,000 tons for the first two vessels. In June 2005, WG made a shipment of 68,143 tons of coal to Trasteco on a third vessel. Upon information and belief, SEC's commission was $136,286.

### SEC Bribes Sapir

22.     In order to further his fraudulent scheme, Lemster bribed Sapir to improperly influence decisions made regarding Trasteco and the coal purchase contracts with WG and to induce his support in Lemster obtaining the secret commission.

23.     On February 23, 2005, SEC wired $130,000 to Sapir as his commission on the first two vessels. Upon information and belief, SEC wired Sapir a commission on the third vessel.

### Disclosure of the Trasteco Secret Deal

24.     The Trasteco Secret Deal was disclosed on March 3, 2010 when WG produced documents in litigation in the Southern District of West Virginia styled *Kisano Trade and Invest Limited v. Winding Gulf Coal Sales,* No. 2:09-0804 (S.D.W.Va.).

### LEMSTER'S SECRET DEAL RELATED TO KISANO

25.     In 2007, Kisano was in the market as a buyer for large quantities of metallurgical coal. Lemster and Sapir advised Kisano (Svishchov) to purchase the coal from WG.

26.     On August 2, 2007, Kisano, following Lemster's advice, entered into a contract with WG to purchase two vessels of coal at $117.50 ton. In September and October 2007, Lemster and Sapir encouraged Kisano (Svischev) to agree to amendments dated September 25 and October 26, 2007, which added eight more vessels of coal, with escalating price levels to

$128 ton.  Kisano followed these recommendations, and Kisano contracted for eight additional vessels. Lemster never requested compensation for this advice from Svishchov or his principal.

27.     If Svishchov and his principal had known of the Trasteco Secret Deal, they would not have involved Lemster or Sapir in the Kisano transaction.

### SEC's Secret Deal with WG

28.     Unbeknownst to Kisano (Svishchov and his principal), on August 28, 2007, SEC and WG entered into a second secret agreement (the "Kisano Secret Deal") whereby SEC would be paid $5 per ton as the "buyer's agent".  Exhibit B.  To repeat, this contract expressly recognized that SEC was Kisano's agent.

29.     Upon information and belief, WG increased the prices in the contract to cover the $5 per ton "buyer's agent" commission.  Specifically, in setting the price, Lemster encouraged WG to raise the price per ton and coached WG on providing a false justification for the price increase to Kisano.  On October 26, 2007, Lemster sent an email to Fry regarding Vessels 3 and 4 stating: "Make the price $128.00.  Explain that the price increase is due to the increased rail freight and loading costs at the port."  Exhibit C.

### WG Pays SEC Under the Kisano Secret Deal

30.     On October 16, 2007, WG paid SEC $361,371.95 as its $5 per ton commission on Vessel 1.  On February 12, 2008, WG paid SEC $368,160.21 as $5 per ton commission on Vessel 2.

### SEC Bribes Sapir

31.     In order to further his fraudulent scheme, Lemster bribed Sapir to improperly influence decisions regarding Kisano and the coal purchase contracts with WG.

32. On October 16, 2007, SEC wired $249,101.90 to Sapir regarding Vessel 1. On February 13, 2008, SEC wired to Sapir's bank account at LGT Bank Liechtenstein $276,083.00 regarding Vessel 2.

### Disclosure of the Kisano Secret Deal

33. The Kisano Secret Deal was disclosed on March 3, 2010 when WG produced documents in litigation in the Southern District of West Virginia styled *Kisano Trade and Invest Limited v. Winding Gulf Coal Sales,* No. 2:09-0804 (S.D.W.Va.).

### LEMSTER'S OTHER SECRET DEAL INVOLVING THE WARREN PLANT

34. Lemster's above Secret Deals were done in the context of a continuous pattern of fraudulent conduct related to companies involving Svishchov and his principal.

### LEMSTER'S SECRET DEAL INVOLVING THE DISMANTLING AND SHIPPING OF THE WARREN PLANT

35. Plama Ltd. ("Plama") was a limited liability company organizd under the laws of Malta. Svishchov acted on behalf of Plama.[1]

36. Plama sought to enter into contracts to dismantle and ship the equipment of the Warren Plant with Williams Industrial Services, Inc. ("WIS") which was owned by Lloyd Williams ("Williams'). Plama (Svishchov) relied upon the advice and recommendations of Lemster and Sapir with regard to contracting with WIS. In August 2005 Plama and WIS executed a Dismantling Contract for $6,230,750.00. On September 22, 2005, Plama and WIS executed a Shipping Contract for $3,646,100.00.

### SEC's Secret Deal With WIS

37. Unbeknownst to Plama (Svishchov), SEC made a secret deal for a 15% commission in exchange for ensuring Plama awarded the contracts to WIS (the "Plama Secret Deal").

---

[1] Plama has been dissolved. Thus, no claims are brought on behalf of Plama.

38.     The Plama Secret Deal provided that SEC would:

> ... advise and support WIS to win a contract with Plama Limited ("PL") for the dismantling, packaging and loading steel mill equipment from Warren, Ohio to Ukraine (the "Project"); and engineering services ...

Exhibit D.

39. The Plama Secret Deal provided that, even though Lemster and SEC were acting as

Plama's agents:

> SEC shall provide the following services that shall be related to the Project:
> a.  Assess the competition and advise WIS on a successful bidding strategy.
> b.  Help to negotiate necessary side agreement with [Plama].
> c.  Assist with communication issues regarding [Plama].

Exhibit D.

40. The Plama Secret Deal's payment terms were contingent on WIS obtaining the contracts

with Plama:

> [I]n case that WIS will be awarded by [Plama] with a contract for performing the Project or part of the Project
>                \*   \*   \*
> WIS will pay SEC 15% (Fifteen Percent) of the total Current & Potential Contract Value for the Removal Project.
> WIS will pay SEC 15% (Fifteen Percent) of the total Estimated Cost for the Shipping Project Calculated Prior to Contract Award.
> WIS will pay SEC 15% (Fifteen Percent) of the total Estimated Cost for the Engineering Project Calculated Prior to Contract Award.
>                \*   \*   \*
> The actual payment shall be carried out in increments, which are due every time WIS receives a payment for its services for PL, within one week of such receipt.

ExhibitD.

41. Lemster knew the Plama Secret Deal was potentially explosive if found out and thus

included the following language in the contract:

> CONFIDENTIALITY - WIS and SEC agree to keep the terms and the very existence of this agreement completely confidential from the third parties in perpetuity.

8

Exhibit D.

42.  Upon information and belief, Lemster encouraged Williams to inflate the Dismantling and Shipping Contracts by at least 15% to cover the commissions for the Plama Secret Deal. Lemster never disclosed that SEC was receiving a secret commission from Williams while he was serving as Plama's agent in regard to the Plama-Williams contracts.

## WIS Paid SEC Under The Plama Secret Deal

43. On August, 2005 a payment was made on behalf of Plama to WIS $359,000 under the Dismantling Contract.  On September 16, 2005 WIS paid SEC $53,850.00 as its 15% commission.

44. On September 30, 2005 Plama paid WIS $364,610.00 under the Shipping Contract.   On October 31, 2005 WIS paid SEC $54,691.50 as its 15% commission.

45. On November 7, 2005 Plama paid $501,543.41 to WIS under the Dismantling and Shipping Contracts.  Upon information and belief, WIS paid SEC $75,231.51 as its 15% from this payment.

## SEC Bribed Sapir

46. In order to further the fraudulent scheme, Lemster bribed Sapir to improperly influence Plama with regard to the award and terms of the Dismantling and Shipping Contracts.

47. On September 26, 2005, SEC paid $23,302.15 via international bank wire to Sapir's account at Banco De Andalucia in Marbella, Spain.  This payment was one-half of the September 16, 2005 payment of $53,850, less expenses.

48. On November 9, 2005, SEC paid $27,345.75 via international bank wire to Sapir's account at Banco De Andalucia in Marbella, Spain.   This payment was one-half the October 31, 2005 payment of $54,691.50.

### Plama Cancelled The Dismantling and Shipping Contracts

49. In November 2005, Plama exercised its rights to suspend work and cancelled the Dismantling and Shipping Contracts.

### LEMSTER'S VEOLIA SECRET DEAL

50. After cancellation of the Dismantling and Shipping Contracts in November 2005, Svishchov and, upon information and belief, Sapir, informed Lemster that the Warren Plant would be reopened.   Boris Bannai ("Bannai") was entrusted with reopening the plant.

51. The adjacent water treatment facility and electric substation (the "Water Treatment Facility") was essential for operation of the Warren Plant.   The Water Treatment Facility was owned by Veolia Water North America ("Veolia").

52. Lemster knew Veolia did not wish to operate the Water Treatment Facility for the Warren Plant and was interested in selling it.   Lemster also knew the Warren Plant needed to utilize the Water Treatment Facility as it would be very expensive to build a replacement.

### SEC's Secret Deals with Veolia

53. Taking advantage of his position of trust in learning that the Warren Plant would be restarted, on November 29, 2005, SEC secretly executed a purchase agreement for the Water Treatment Facility for $375,000.   However, SEC did not close on the purchase agreement. Instead, in December 2005, Lemster secretly proposed to Veolia that they "jointly" market the Water Treatment Facility. Thereafter, in February 2006 SEC and Veolia secretly agreed that would share 50/50 any amounts above a $375,000 sale price for the Water Treatment Facility. Exhibit E.

54. In April, 2006, a company controlled by Bannai purchased the Water Treatment Facility for $650,000.   Bannai's company then sold the Water Treatment Facility at same price to the

Warren Plant. Upon information and belief, Lemster and Sapir encourage Bannai to pay $650,000 for the Water Treatment Plant, while concealing that Veolia was willing to sell the facility for $375,000.

### Veolia Pays SEC under the Veolia Secret Deal

55. In April 2006, Veolia and SEC spilt the net gain of $275,000 and Veolia paid $137,500 to SEC.

### SEC Bribes Sapir

56. In order to further his fraudulent scheme, SEC bribed Sapir to improperly influence Bannai in regard to the purchase of the Veolia Water Treatment Facility and to conceal the Veolia Secret Deal from Bannai and Svishchov.

57. On July 27, 2006 SEC wired $23,400 to Sapir's bank account at Banque du Geston De Rothschild in Monaco as his "share" of the Veolia Secret Deal.

### RICO ALLEGATIONS

58. The Enterprise. SEC is an "enterprise" within the meaning of 18 U.S.C. §1961(4) and 1962(c) and engaged in activities that affected interstate and foreign commerce.

59. Conduct and Participation: Lemster conducted and participated in the SEC Enterprise as its president and, upon information and belief, its controlling shareholder, through a pattern of racketing activity within the meaning of 18 U.S.C. §1962(c).

60. Pattern of Racketeering Activity. The pattern of racketeering activity was within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c), including violations of the mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), commercial bribery (18 Pa.C.S.§ §4108), and the Travel Act (18 U.S.C. § 1952) statutes.

61. <u>Continuity of Conduct.</u>  The Illegal Scheme began no later than 2004 with the Trasecto

Secret Deal and ended no earlier than 2008 when SEC paid a bribe to Sapir arising from the

Kisano Secret Deal.    The Illegal Scheme was open ended in that Lemster and SEC would have

continued to defraud companies managed by Svishchov but for the discovery of the secret deals.

62. <u>Injury in Business By A Violation of §1962(c):</u>   Trasteco and Kisano suffered loss in

their business as a direct and proximate result of the acts which comprised the pattern of

racketeering by paying inflated prices on the contracts with Winding Gulf.

### THE PREDICATE ACTS OF RACKETEERING

### Mail and Wire Fraud

63. The Illegal Scheme included acts of mail and wire fraud as described herein in violation

of 18 U.S.C. §1341 and §1343.

### The Illegal Scheme Against Trasteco

64.    Lemster caused SEC to use the wires or US mails in furtherance of the Illegal Scheme,

including:

       a.  January 11, 2005, letter from WG to SEC memorializing the secret commission
          agreement on the Trasteco Secret Deal;

       b.  February 14, 2005, SEC Invoice to WG for its commission on the Secret Deal;

       c.  February 21, 2005, email from Sapir to Lemster with banking wire details in order
          to receive bribe payments;

       d.  February 23, 2005, $260,000 wire from WG to SEC's National City Bank account
          as the $2 per ton commission on the Secret Deal;

       e.  September 23, 2005, $130,000 international bank wire bribe payment to Sapir's
          account at Banco De Andalucia in Marbella, Spain;

       f.  Numerous emails and telephone calls between SEC (Lemster) and WG in
          2004/2005 to effect the Secret Deal;

g. Numerous emails and telephone calls between SEC (Lemster) and Sapir in 2004/2005 to effect the Secret Deal while concealing it from Trasteco;

h. Numerous emails between SEC (Lemster) and/or Sapir with Trasteco (Svishchov) in 2004/2005 designed to induce Trasteco to enter into the contract with WG while concealing the Secret Deal.

### The Illegal Scheme Against Kisano

65. Lemster caused SEC to use the wires or US mails in furtherance of the Illegal Scheme,

including the:

a. August 28, 2007, letter from WG to SEC memorializing the secret commission agreement;

b. October 26, 2007, email from Lemster to WG telling WG to set price at $128 per ton and "explain" the increased price is due to increased rail freight and loading costs, and setting secret commission at $5.00 per ton for Vessels 4 and 5, and $5.25 per ton for Vessels 6 through 10;

c. February 12, 2008, SEC Invoice for $368,160.21 to WG as $5 per ton commission on Vessel No. 2;

d. October 16, 2007, WG paid $361,371.95 to SEC as its $5 per ton commission for Vessel 1;

e. November 6, 2007 February 13, 2008, SEC wired a bribe of $249,101.90 to Sapir's account at LGT Bank Liechtenstein;

f. February 12, 2008, WG paid SEC $368,160.21 as its $5 per ton commission on Vessel 2;

g. February 13, 2008, SEC wired a bribe of $267,083 to Sapir's account at LGT Bank Liechtenstein;

h. Numerous emails and telephone calls between SEC (Lemster) and WG in 2007/2008 to effect the Kisano Secret Deal;

i. Numerous emails and telephone calls between SEC (Lemster) and Sapir in 2007/2008 to effect the Kisano Secret Deal while concealing it from Kisano;

j. Numerous emails between SEC (Lemster) and/or Sapir with Kisano (Svishchov) in 2007/2008 designed to induce Kisano to enter into the contract with WG while concealing the Kisano Secret Deal.

## The Illegal Scheme Against Plama

66. Lemster caused SEC to use wires or US mails in furtherance of the Illegal Scheme related to Plama, including:

   a. Numerous emails and telephone calls between SEC (Lemster) and Williams in 2005 to effect the Plama Secret Deal;

   b. Numerous emails and telephone calls between SEC (Lemster) and Sapir in 2005 to effect the Plama Secret Deal while concealing it from Plama;

   c. Numerous emails between SEC (Lemster) and/or Sapir with Plama (Svishchov) in 2005 designed to induce Plama to enter into the contract with Williams while concealing the Plama Secret Deal.

   d. September 26, 2005, Invoice from Sapir to SEC for his share of payments from WIS to SEC under the Plama Secret Deal;

   e. September 27, 2005, emails between SEC and Sapir regarding payment of his share under the Plama Secret Deal;

   f. October 31, 2005, email from WIS to SEC discussing increasing the price of Dismantling and Shipping Contracts by 15%;

   g. November 9, 2005, Invoice from Sapir to SEC for his share of payments from WIS to SEC under the Plama Secret Deal;

   h. September 26, 2005, $23,302.15 international bank wire to Sapir's account at Banco De Andalucia in Marbella, Spain;

   i. November 9, 2005, $27,345.75 international bank wire to Sapir's account at Banco De Andalucia in Marbella, Spain;

   j. September 27, 2006, $23,400 international wire to Sapir's account at Banque de Gestion De Rothschild in Monaco.

## The Illegal Scheme Related to Veolia

67. Lemster caused SEC to use the wires or US mails in furtherance of the Veolia Secret Deal, including:

a.  Numerous emails and telephone calls between SEC (Lemster) and Veolia to negotiate and complete SEC's November 29, 2005 secret purchase of the Water Treatment Facility;

b.  Emails dated April 4, 2006 between SEC (Lemster) and Veolia regarding their secret deal to spilt the sales price for the Water Treatment Facility above $375,000;

c.  Numerous emails and telephone calls between SEC (Lemster) and Veolia in 2005/2006 to effect the Veolia Secret Deal;

d.  Numerous emails and telephone calls between SEC (Lemster) and Sapir in 2005/2006 to effect the Veolia Secret Deal while concealing it from Bannai and Svishchov;

e.  Numerous emails between SEC (Lemster) and/or Sapir with Bannai in 2005/2006 designed to induce Bannai to enter into the contract with Veolia while concealing the Veolia Secret Deal.

### Commercial Bribery

68. The Illegal Scheme included acts of commercial bribery in violation of 18 Pa.C.S. §4108 which are punishable by a term of two years imprisonment.

69. Lemster caused SEC to commit commercial bribery by receiving in Pennsylvania funds from WG to induce him to influence the decisions of as the agent of Trasteco and Kisano as set forth above, as well as Plama.

70. Lemster caused SEC to commit commercial bribery by paying Sapir to influence the decisions as the agent of Trasteco and Kisano as set forth above, as well as Plama.

### COUNT I

### VIOLATION OF RICO 18 U.S.C. §1962(c)
### Lemster

71. Plaintiffs incorporate by reference all preceding paragraphs as if set forth in full.

72. Lemster conducted and participated in the conduct of the affairs of the SEC enterprise through a pattern of racketeering activity which effected interstate and foreign commerce.

15

73. The pattern of racketeering activity included mail fraud, wire fraud, and bribery as set forth above.

74. As a direct and proximate cause of the above pattern of racketeering, Plaintiffs suffered damage in property and business, including, but not limited to:

      a.  Trasteco paying an inflated amount of at least the amount of the secret commission of $396,286 on the WG contract;

      b.  Kisano paying an inflated amount of at least the amount of the secret commission of $729,532.16 on the WG contract.

## COUNT II

### INTENTIONAL INFERENCE WITH THE WINDING GULF CONTRACTS
### Lemster and SEC

75. Plaintiffs incorporate by reference all preceding paragraphs as if set forth in full.

76. Lemster and SEC's conduct intentionally and improperly interfered in the Trasteco/WG and Kisano/WG coal sale contracts.

77. Lemster and SEC's conduct increased the cost by the amount of the secret commissions.

78. Lemster and SEC had no privilege or justification for securing and being paid on the Trasteco and Kisano Secret Deals.

79. Lemster and SEC purposefully and intentionally interfered in the contractual relationship between Trasteco/WG and Kisano/WG by paying bribes to Sapir so that he would make recommendations and decisions contrary to the interests of Trasteco and Kisano.

## COUNT III

### UNJUST ENRICHMENT
### Lemster and SEC

80. Plaintiffs incorporate by reference all preceding paragraphs as if set forth in full.

16

81. As a result of Lemster and SEC's conduct with regard to the Trasteco and Kisano Secret Deals, as set forth above, Lemster and SEC have been unjustly enriched in that they have obtained and retained the benefits of payments totaling in excess of $1 million.

## COUNT IV

### BREACH OF FIDUCIARY DUTY/
### IMPROPER USE OF CONFIDENTIAL INFORMATION AND RELATIONS
### Lemster and SEC

82. Plaintiffs incorporate by reference all preceding paragraphs as if set forth in full.

83. At all times relevant hereto, Lemster and SEC acted as the agents and fiduciary of Kisano and Trasteco.

84. As an agent of Trasteco and Kisano, Lemster and SEC owed duties of care, loyalty, good faith and candor. As detailed above, Lemster and SEC violated such duties by orchestrating and entering into the Secret Deals; providing advice contrary to the interests of Trasteco and Kisano but in the interests of Lemster and SEC; and paying bribes to Sapir to compromise his duties and obligations.

85. Trasteco and Kisano suffered monetary damages by Defendants' conduct in the form of paying higher prices on contracts entered into with WG.

86. SEC and Lemster are required to disgorge any secret commissions which they made while serving as agents of Trasteco and Kisano.

WHEREFORE, Plaintiffs request relief as follows:

    a.  Compensatory damages in excess of $1 million;

    b.  Disgorgement of all secret fees and commission;

    c.  Treble damages under RICO, plus costs and attorney fees;

    d.  Such other relief which is just and equitable.

MARKS & SOKOLOV, LLC

By:      */s/Bruce S. Marks*  

        Bruce S. Marks, Esquire  
        Thomas Sullivan, Esquire  
        Marks & Sokolov, LLC  
        1835 Market Street 28th Floor  
        Philadelphia, Pennsylvania 19103  
        Marks@mslegal.com  
        (215) 569-8901  


BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.

By:      */s/Kevin K. Douglass*  
        Kevin K. Douglass, Esquire (PA ID 47748)  
        Two Gateway Center, 6th Floor  
        Pittsburgh, Pennsylvania 15222  
        kdouglass@babstcalland.com  
        (412) 394-5400  

        Counsel for the Plaintiffs