**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KISANO TRADE & INVEST LIMITED,** ) | |
| **TRASTECO LTD, and** ) | |
| **VADIM SHULMAN** ) | |
| ) | |
| **Plaintiffs,** ) | Civil Action No. 2:11-cv-00852 |
| **v.** ) | |
| ) | |
| **DEV LEMSTER,** ) | |
| **STEEL EQUIPMENT CORP,** ) | |
| **AKIVA SAPIR, and** ) | |
| **SAPIR ENTITIES 1-100.** ) | |
| ) | |
| **Defendants.** ) | |

## AMENDED COMPLAINT

Plaintiffs Kisano Trade & Invest Limited ("Kisano"), Trasteco Ltd. ("Trasteco"), and

Vadim Shulman ("Shulman"), complain, as follows:

## INTRODUCTION

1.      Shulman is a prominent businessman originally from Ukraine who is the

beneficial owner of Kisano and Trasteco.  Defendants Dev Lemster ("Lemster") and his

Pittsburgh based company, Steel Equipment Corporation ("SEC"), and Akiva Sapir ("Sapir")

were agents of Plaintiffs who abused their position of trust to use information provided in

confidence to collect secret profits and commissions from secret deals related to Plaintiffs'

business from 2001 through 2008 (collectively, the "Illegal Scheme"). As part of the Illegal

Scheme, Defendants committed a pattern of racketeering including the receipt of secret profits

and commissions and payment of bribes to Sapir through the U.S. wires and mails.

2.      Trasteco and Kisano only uncovered the Illegal Scheme through discovery in

litigation involving a third party in 2010 and only confirmed Sapir's involvement at a deposition

on April 26, 2010. Trasteco and Kisano filed a writ of summons in Pennsylvania state court against Sapir to preserve the claims from a limitations defense on April 20, 2012.  Shulman only discovered the fraud against him through an investigation which took place within the past two months in 2012 after Lemster's counsel professed Lemster had few assets, which caused review of the 2001 transactions, which revealed Lemster's apparently secret Swiss bank account. Prior to this disclosure, Shulman had no reason to believe that Lemster had engaged in a fraud in 2001 expressly directed at obtaining money from him, as opposed to secret commissions paid by third parties in regard to the other Plaintiffs.

3.      Plaintiffs seek compensatory damages in excess of $7 million, trebled in excess of $21 million under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* as well as punitive damages under various state law claims.

## JURISDICTION AND VENUE

4.      Federal question jurisdiction lies pursuant to 28 U.S.C. §1331 and 1337(a) and 18 U.S.C. §1964(c) because this case arises under the laws of the United States based on claims under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

5.      Venue is proper under 18 U.S.C. §1965 because SEC and Lemster are resident in this District and all Defendants transacts their affairs in this District and 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiffs

6.      Plaintiff Kisano Trade & Invest Limited ("Kisano") is a corporation organized under the laws of the Republic of Cyprus.

7.     Plaintiff Trasteco, Ltd. ("Trasteco") is a limited liability company organized under the laws of Malta.

8.     Plaintiff Vadim Shulman ("Shulman") is a citizen of Israel.

9.     Plaintiffs are each a "person" within the meaning of 18 U.S.C. §1961(3) and 1964(c).

10.    George Svishchov ("Svishchov") is a citizen of Ukraine who assisted Trasteco, Kisano, and Shulman in the business dealings at issue.

**Defendants**

11.    Defendant Steel Equipment Corp. ("SEC") is a corporation organized under the laws of Pennsylvania with a principal place of business in Pittsburgh, Pennsylvania. SEC is engaged in the business of buying and selling used steel making equipment and providing advisory, appraisal and consulting services.

12.    Defendant Dev Lemster ("Lemster") is a citizen of Pennsylvania. Lemster is the president and, upon information and belief, the sole owner of SEC.

13.    Defendant Akiva Sapir ("Sapir") is, upon information and belief, a citizen of Israel.

14.    Defendants Sapir Entities 1-100 (collectively, the "Sapir Entities") are entities, identities unknown, owned or controlled by Sapir which received funds from the wrongdoing alleged herein.

## FACTS

## BACKGROUND

### The Kansas City Caster Deal

15.     On or about 2000, Lemster was contacted by Sapir, an Israeli attorney/businessman who represented Shulman, one of the owners of a steel mill in Ukraine, who were looking to upgrade the facility. At all times relevant hereto, Lemster knew that Sapir was an agent providing advice to Shulman and Svishchov.

16.     Thereafter, Lemster advised Shulman and Svishchov in purchasing steel making equipment from Kansas City (the "Kansas City Caster Deal"), which was shipped to Ukraine.

17.     As a result of the Kansas City Caster Deal, Lemster became trusted for business advice by Shulman and Svishchov.

18.     Shulman is currently investigating whether Defendants obtained secret profits from this transaction.

## THE FRAUDS

### DEFENDANTS' WARREN EQUIPMENT SECRET PROFITS

19.     In 2001, Defendants assisted Shulman in the acquisition of a shuttered steel making facility located in Warren, Ohio (the "Warren Plant").

20.     Shulman formed a company called Warren Steel Holdings, LLC ("Warren Steel"), which acquired the plant and its real estate from Copperweld Steel Company, Inc. ("CSC") through a bankruptcy proceeding. Eckert Seamans ("Eckert") represented Warren Steel.

21.     Shulman appointed Sapir as his agent to acquire the equipment of the plant (the "Warren Equipment"). Eckert represented Sapir as Shulman's agent in acquiring the Warren Equipment.  Shulman paid the fees incurred by Eckert in representing Sapir as his agent.

Ultimately, Sapir entered into an agreement by which he paid $6.6 million for the equipment. Shulman wired this money to Eckert; $6 million was paid to CSC and $600,000 to a broker.

22.     Based on a response to a subpoena by Eckert, it appears that Eckert believed that Sapir was its client, even though he was acting solely as the agent of Shulman, and Shulman paid Eckert's fees related to the Warren Equipment. If Sapir made such a representation and Eckert believed such, Sapir was using Eckert to achieve a fraudulent scheme, i.e. to purchase the Warren Equipment at an arm's length price and then to earn a secret profit by misrepresenting the purchase price to Shulman.

### Defendants' Warren Equipment Secret Profit

23.     Unbeknownst to Shulman, the $6.6 million was the full price of the Warren Equipment.  Contrary to this, Defendants represented to Shulman that the price was higher. Shulman was told that the $6.6 million was an initial payment and that SEC would provide "financing" of the balance of the purchase price in return for Shulman making six payments of approximately $908,000 to SEC, see Exhibit F, plus other payments to Sapir. In fact, the only initial deposit which was required was $500,000, which Shulman wired to Sapir, and the $500,000 should have been deducted from the $6.6 million. Upon information and belief, Sapir improperly kept this $500,000 payment.

24.     In addition, Shulman was informed that a $500,000 payment needed to be paid to "Bob Stamp" who allegedly acted as a consultant on behalf of Defendants. See Exhibit F.

25.     In reliance on these representations, Shulman wired $500,000 for Stamp plus four payments of approximately $908,000 each to SEC/Lemster's bank account in Switzerland and two payments of approximately $908,000 to SEC's bank account in the U.S. in 2001 and early

2002.  Shulman also wired monies to Sapir, including the above $500,000 deposit and is currently investigating whether these monies represented additional secret profits by Defendants.

26.     Defendants obtained secret profits of at least $5.4 million through their deception (the "Warren Equipment Secret Profits").

### SEC Bribes Sapir

27.     In order to further the fraudulent scheme, upon information and belief, Lemster bribed Sapir to improperly influence decisions by Shulman regarding the purchase of the Warren Equipment and to induce his support of Lemster.   Shulman will seek production of SEC/Lemster's bank records in discovery to evidence these bribes.

### Lemster's Management of the Warren Plant

28.     In early 2002, Lemster, through SEC, began providing management services to the Warren Plant. From February 2002 through February 2006, SEC issued monthly invoices for expenses related to the Warren Plant. In exchange for its services, SEC collected royalties from gas wells located at the Warren Plant. SEC's compensation for the services provided was open and fully disclosed to Shulman, and Svishchov.

### DEFENDANTS' SECRET DEAL RELATED TO TRASTECO

29.     In 2004, Sapir asked Lemster if he could advise a source of coal for shipment to Ukraine. Lemster recommended Andy Fry of Winding Gulf, LLC ("WG") based in North Carolina. Lemster never requested compensation for this advice from Shulman or Svishchov.

30.     WG proposed selling several hundred thousand tons of coal to Trasteco at $128 per ton, and various other conditions. Lemster and Sapir assisted Svishchov in negotiating the terms of the contract with WG.

31.     On December 20, 2004, Trasteco entered into a contract to purchase 120,000 metric tons (plus or minus 10%) of metallurgical coal at $120 per ton, as amended on January 4, 2005, which was divided into two shipments and later increased to additional shipments.

### SEC's Secret Deal with WG

32.     Unbeknownst to Trasteco (Shulman, Svishchov), on January 11, 2005 SEC and WG entered into a secret agreement (the "Trasteco Secret Deal") whereby SEC would be paid $2 per ton as the "buyer's agent". Exhibit A. To repeat, this contract expressly recognized that SEC was Trasteco's agent.

33.     Upon information and belief, WG increased the prices in the contract to cover the $2 per ton "buyer's agent" commission.

### WG Pays SEC under The Trasteco Secret Deal

34.     On or about February 14, 2005, WG paid SEC $260,000 as its $2 per ton commission on 130,000 tons for the first two vessels. In June 2005, WG made a shipment of 68,143 tons of coal to Trasteco on a third vessel. Upon information and belief, SEC's commission was $136,286.

### SEC Bribes Sapir

35.     In order to further his fraudulent scheme, Lemster bribed Sapir to improperly influence decisions made regarding Trasteco and the coal purchase contracts with WG and to induce his support in Lemster obtaining the secret commission.

36.     On February 23, 2005, SEC wired $130,000 to Sapir as his commission on the first two vessels. Upon information and belief, SEC wired Sapir a commission on the third vessel.

**Disclosure of the Trasteco Secret Deal**

37.     The Trasteco Secret Deal was disclosed on March 3, 2010 when WG produced documents in litigation in the Southern District of West Virginia styled *Kisano Trade and Invest Limited v. Winding Gulf Coal Sales,* No. 2:09-0804 (S.D.W.Va.). However, Trasteco was unable to confirm that Sapir participated in the deal until Lemster's deposition was taken on April 26, 2010.

**DEFENDANTS' SECRET DEAL RELATED TO KISANO**

38.     In 2007, Kisano was in the market as a buyer for large quantities of metallurgical coal. Lemster and Sapir advised Kisano (Svishchov) to purchase the coal from WG.

39.     On August 2, 2007, Kisano, following Lemster's advice, entered into a contract with WG to purchase two vessels of coal at $117.50 ton. In September and October 2007, Lemster and Sapir encouraged Kisano (Svishchov) to agree to amendments dated September 25 and October 26, 2007, which added eight more vessels of coal, with escalating price levels to $128 ton. Kisano followed these recommendations, and Kisano contracted for eight additional vessels. Lemster never requested compensation for this advice from Shulman or Svishchov.

40.     If Shulman and Svishchov had known of the Trasteco Secret Deal, they would not have involved Lemster or Sapir in the Kisano transaction.

**SEC's Secret Deal with WG**

41.     Unbeknownst to Kisano (Shulman, Svishchov), on August 28, 2007, SEC and WG entered into a second secret agreement (the "Kisano Secret Deal") whereby SEC would be paid $5 per ton as the "buyer's agent". Exhibit B. To repeat, this contract expressly recognized that SEC was Kisano's agent.

42.     Upon information and belief, WG increased the prices in the contract to cover the $5 per ton "buyer's agent" commission. Specifically, in setting the price, Lemster encouraged WG to raise the price per ton and coached WG on providing a false justification for the price increase to Kisano. On October 26, 2007, Lemster sent an email to Fry regarding Vessels 3 and 4 stating: "Make the price $128.00. Explain that the price increase is due to the increased rail freight and loading costs at the port." Exhibit C.

### WG Pays SEC Under the Kisano Secret Deal

43.     On October 16, 2007, WG paid SEC $361,371.95 as its $5 per ton commission on Vessel 1. On February 12, 2008, WG paid SEC $368,160.21 as $5 per ton commission on Vessel 2.

### SEC Bribes Sapir

44.     In order to further his fraudulent scheme, Lemster bribed Sapir to improperly influence decisions regarding Kisano and the coal purchase contracts with WG.

45.     On October 16, 2007, SEC wired $249,101.90 to Sapir regarding Vessel 1. On February 13, 2008, SEC wired to Sapir's bank account at LGT Bank Liechtenstein $276,083.00 regarding Vessel 2.

### Disclosure of the Kisano Secret Deal

46.     The Kisano Secret Deal was disclosed on March 3, 2010 when WG produced documents in litigation in the Southern District of West Virginia styled *Kisano Trade and Invest Limited v. Winding Gulf Coal Sales,* No. 2:09-0804 (S.D.W.Va.). Kisano was unable to confirm that Sapir participated in the deal until his deposition was taken on April 26, 2010.

## DEFENDANTS' OTHER SECRET DEAL
## INVOLVING THE WARREN PLANT

47.     Defendants' above Secret Deals were done in the context of a continuous pattern

of fraudulent conduct related to companies involving Shulman and Svishchov.

## DEFENDANTS' SECRET DEAL INVOLVING

## THE DISMANTLING AND SHIPPING OF THE WARREN PLANT

48.     Plama Ltd. ("Plama") was a limited liability company organizd under the laws of

Malta. Svishchov acted on behalf of Plama.[1]

49.     Plama sought to enter into contracts to dismantle and ship the equipment of the

Warren Plant with Williams Industrial Services, Inc. ("WIS") which was owned by Lloyd

Williams ("Williams'). Plama (Shulman, Svishchov) relied upon the advice and

recommendations of Lemster and Sapir with regard to contracting with WIS.   In August 2005

Plama and WIS executed a Dismantling Contract for $6,230,750.00. On September 22, 2005,

Plama and WIS executed a Shipping Contract for $3,646,100.00.

## SEC's Secret Deal With WIS

50.     Unbeknownst to Plama (Shulman, Svishchov), SEC made a secret deal for a 15%

commission in exchange for ensuring Plama awarded the contracts to WIS (the "Plama Secret

Deal").

51.     The Plama Secret Deal provided that SEC would:

> ... advise and support WIS to win a contract with Plama Limited ("PL") for the
> dismantling, packaging and loading steel mill equipment from Warren, Ohio to
> Ukraine (the "Project"); and engineering services ...

Exhibit D.

---

[1] Plama has been dissolved. Thus, no claims are brought on behalf of Plama.

52.     The Plama Secret Deal provided that, even though Lemster and SEC were acting

as Plama's agents:

> SEC shall provide the following services that shall be related to the Project:
> a.  Assess the competition and advise WIS on a successful bidding strategy.
> b.  Help to negotiate necessary side agreement with [Plama].
> c.  Assist with communication issues regarding [Plama].

Exhibit D.

53.     The Plama Secret Deal's payment terms were contingent on WIS obtaining the

contracts with Plama:

> [I]n case that WIS will be awarded by [Plama] with a contract for performing the
> Project or part of the Project
>                               *   * *
> > WIS will pay SEC 15% (Fifteen Percent) of the total Current & Potential
> > Contract Value for the Removal Project.
> > WIS will pay SEC 15% (Fifteen Percent) of the total Estimated Cost for
> > the Shipping Project Calculated Prior to Contract Award.
> > WIS will pay SEC 15% (Fifteen Percent) of the total Estimated Cost for
> > the Engineering Project Calculated Prior to Contract Award.
>                               *   * *
> The actual payment shall be carried out in increments, which are due every time
> WIS receives a payment for its services for PL, within one week of such receipt.

Exhibit D.

54.     Lemster knew the Plama Secret Deal was potentially explosive if found out and

thus included the following language in the contract:

> <u>CONFIDENTIALITY</u> - WIS and SEC agree to keep the terms and the very
> existence of this agreement completely confidential from the third parties in
> perpetuity.

Exhibit D.

55.     Upon information and belief, Lemster encouraged Williams to inflate the

Dismantling and Shipping Contracts by at least 15% to cover the commissions for the Plama

Secret Deal. Lemster never disclosed that SEC was receiving a secret commission from Williams while he was serving as Plama's agent in regard to the Plama-Williams contracts.

### WIS Paid SEC Under The Plama Secret Deal

56.     On August, 2005 a payment was made on behalf of Plama to WIS $359,000 under the Dismantling Contract. On September 16, 2005 WIS paid SEC $53,850.00 as its 15% commission.

57.     On September 30, 2005 Plama paid WIS $364,610.00 under the Shipping Contract. On October 31, 2005 WIS paid SEC $54,691.50 as its 15% commission.

58.     On November 7, 2005 Plama paid $501,543.41 to WIS under the Dismantling and Shipping Contracts. Upon information and belief, WIS paid SEC $75,231.51 as its 15% from this payment.

### SEC Bribed Sapir

59.     In order to further the fraudulent scheme, Lemster bribed Sapir to improperly influence Plama with regard to the award and terms of the Dismantling and Shipping Contracts. On September 26, 2005, SEC paid $23,302.15 via international bank wire to Sapir's account at Banco De Andalucia in Marbella, Spain. This payment was one-half of the September 16, 2005 payment of $53,850, less expenses.

60.     On November 9, 2005, SEC paid $27,345.75 via international bank wire to Sapir's account at Banco De Andalucia in Marbella, Spain. This payment was one-half the October 31, 2005 payment of $54,691.50.

### Plama Cancelled The Dismantling and Shipping Contracts

61.     In November 2005, Plama exercised its rights to suspend work and cancelled the Dismantling and Shipping Contracts.

### DEFENDANTS' VEOLIA SECRET DEAL

62.     After cancellation of the Dismantling and Shipping Contracts in November 2005, Svishchov and, upon information and belief, Sapir, informed Lemster that the Warren Plant would be reopened. Boris Bannai ("Bannai") was entrusted with reopening the plant.

63.     The adjacent water treatment facility and electric substation (the "Water Treatment Facility") was essential for operation of the Warren Plant. The Water Treatment Facility was owned by Veolia Water North America ("Veolia").

64.     Lemster knew Veolia did not wish to operate the Water Treatment Facility for the Warren Plant and was interested in selling it. Lemster also knew the Warren Plant needed to utilize the Water Treatment Facility as it would be very expensive to build a replacement.

### SEC's Secret Deals with Veolia

65.     Taking advantage of his position of trust in learning that the Warren Plant would be restarted, on November 29, 2005, SEC secretly executed a purchase agreement for the Water Treatment Facility for $375,000. However, SEC did not close on the purchase agreement. Instead, in December 2005, Lemster secretly proposed to Veolia that they "jointly" market the Water Treatment Facility. Thereafter, in February 2006 SEC and Veolia secretly agreed that would share 50/50 any amounts above a $375,000 sale price for the Water Treatment Facility. Exhibit E.

66.     In April, 2006, a company controlled by Bannai purchased the Water Treatment Facility for $650,000. Bannai's company then sold the Water Treatment Facility at same price to the Warren Plant. Upon information and belief, Lemster and Sapir encourage Bannai to pay $650,000 for the Water Treatment Plant, while concealing that Veolia was willing to sell the facility for $375,000.

**Veolia Pays SEC under the Veolia Secret Deal**

67.    In April 2006, Veolia and SEC spilt the net gain of $275,000 and Veolia paid

$137,500 to SEC.

**SEC Bribes Sapir**

68.    In order to further his fraudulent scheme, SEC bribed Sapir to improperly

influence Bannai in regard to the purchase of the Veolia Water Treatment Facility and to conceal

the Veolia Secret Deal from Bannai and Svishchov.

69.    On July 27, 2006 SEC wired $23,400 to Sapir's bank account at Banque du

Geston De Rothschild in Monaco as his "share" of the Veolia Secret Deal.

## RICO ALLEGATIONS

70.    **The SEC Enterprise**. SEC is an "enterprise" within the meaning of 18 U.S.C.

§1961(4) and 1962(c) and engaged in activities that affected interstate and foreign commerce.

71.    **The SEC/Lemster/Sapir Association-in-Fact Enterprise** ("SLS Enterprise"):

SLS is an "enterprise" within the meaning of 18 U.S.C. §1961(4) and 1962(c) and engaged in

activities that affected interstate and foreign commerce. The purpose of the SLS association-in-

fact was to engage in business transactions and make money in the coal and steel markets,

including those transactions with Plaintiffs. The relationships between those involved in the SLS

association-in-fact, i.e. SEC, Lemster, and Sapir, were that (a) SEC served as the corporate entity

which had a physical address and bank account and was party to numerous contracts in which the

enterprise was involved, including the "Secret Profits and Deals" described herein; (b) Lemster

managed the activities of SEC and its bank accounts (whether those of SEC or Lemster),

including negotiation of its contracts, including the "Secret Profits and Deals" described herein;

and (c) Sapir managed the business relationships of the enterprise, including those with Plaintiffs

as well as those with Warren Steel and Plama. The <u>longevity</u> of the SLS association-in-fact is evidenced by the transactions described above, which began in 2000 (Kansas City Caster) and lasted until no earlier than 2008 (Kisano).

72.     **Conduct and Participation: SEC:** Lemster conducted and participated in the SEC Enterprise as its president and, upon information and belief, its controlling shareholder, through a pattern of racketing activity within the meaning of 18 U.S.C. §1962(c).

73.     **Conduct and Participation: SLS**: Lemster and Sapir conducted and participated in the SLS Enterprise through a pattern of racketing activity within the meaning of 18 U.S.C. §1962(c).

74.     **Pattern of Racketeering Activity**. The pattern of racketeering activity was within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c), including violations of the mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), commercial bribery (18 Pa.C.S. § 4108), and the Travel Act (18 U.S.C. § 1952) statutes.

75.     **Continuity of Conduct**. The Illegal Scheme began no later than 2001 with the "Warren Equipment Secret Profits" and ended no earlier than 2008 when SEC paid a bribe to Sapir arising from the Kisano Secret Deal.   The Illegal Scheme was open ended in that Defendants would have continued to defraud Shulman and companies of which he was the beneficial owner and which Svishchov managed but for the discovery of the secret deals.

76.     **Injury in Business By A Violation of §1962(c) and (d):** Plaintiffs suffered loss in their business as a direct and proximate result of the acts which comprised the pattern of racketeering by paying inflated prices for the Warren Equipment and on the contracts with Winding Gulf.

## THE PREDICATE ACTS OF RACKETEERING

## Mail and Wire Fraud

77.     The Illegal Scheme included acts of mail and wire fraud as described herein in

violation of 18 U.S.C. §1341 and §1343.

## The Illegal Scheme Against Shulman

78.     Lemster and Sapir caused SEC and SLS to use the wires or US mails in

furtherance of the Illegal Scheme, including:

   a.  October 28, 2001 fax from Sapir to Shulman setting forth a schedule of 6
       payments of $908,333 each to SEC "for the financing of the purchase of CSC
       caster and meltshop", Exhibit F.[2]

   b.  October 28, 2001 fax from Sapir to Shulman requesting Shulman pay $70,000 in
       legal fees to Eckert; and, $500,000 to Lemster's bank account at Credit Suisse in
       Luzern Switzerland, for purported services from "Bob Stamp ... helping us get
       the purchase price we wanted." Exhibit F.

   c.  6 November 2001 fax from SEC requesting that the below wire transfers be
       made.

   d.  $5,950,000 wired to Lemster's bank account at Credit Suisse in Luzern,
       Switzerland or SEC's bank account in the U.S.:

       | | | | |
       |---|---|---|---|
       | i. | November 6, 2001 | $ 500,000 | Lemster: Credit Suisse |
       | ii. | November 9, 2001 | $ 908,333 | SEC: Nat. City Bank |
       | iii. | November 11, 2001 | $ 909,000 | Lemster:Credit Suisse |
       | iv. | December 6, 2002 | $ 909,000 | Lemster:Credit Suisse |
       | v. | December 20, 2001 | $ 909,000 | Lemster:Credit Suisse |
       | vi. | January 3, 2002 | $ 908,333 | Lemster:Credit Suisse |
       | vii. | January 23, 2002 | $ 906,334 | SEC: Nat. City Bank |

   e.  $7,285,000 wired to Eckert's account at Mellon Bank:

       | | | |
       |---|---|---|
       | i. | October 25, 2001 | $6,600,000 |
       | ii. | October 30, 2001 | $   70,000 |
       | iii. | November 14, 2001 | $ 100,000 |
       | iv. | November 20, 2001 | $ 100,000 |
       | v. | November 27, 2001 | $ 415,000 |

---

[2] Note: Dates in the exhibits are European format of day, month and year.

f.  $2,300,000 wired to Sapir's account at UBS in Wettingen, Switzerland:

      i.   September 10, 2001  $  120,000
     ii.   October 11, 2001    $1,400,000
   iii.   October 17, 2001    $  500,000
   iv.   February 15, 2002  $  280,000

f.  Upon information and belief, wires from Lemster's bank accounts to Sapir's bank accounts;

g.  Upon information and belief, telephone calls, faxes and emails between Sapir, Lemster, and Eckert with regard to Sapir's purchase of payment for the CSC assets and sale to Shulman;

h.  Upon information and belief, telephone calls, faxes and emails between Sapir and Lemster with regard to Sapir's purchase of the CSC assets; sale of the assets; payment of related funds; and division of profits.

### The Illegal Scheme Against Trasteco

79.  Lemster and Sapir caused SEC and SLS to use the wires or US mails in

furtherance of the Illegal Scheme, including:

a.  January 11, 2005, letter from WG to SEC memorializing the secret commission agreement on the Trasteco Secret Deal;

b.  February 14, 2005, SEC Invoice to WG for its commission on the Secret Deal;

c.  February 21, 2005, email from Sapir to Lemster with banking wire details in order to receive bribe payments;

d.  February 23, 2005, $260,000 wire from WG to SEC's National City Bank account as the $2 per ton commission on the Secret Deal;

e.  September 23, 2005, $130,000 international bank wire bribe payment to Sapir's account at Banco De Andalucia in Marbella, Spain;

f.  Numerous emails and telephone calls between SEC (Lemster) and WG in 2004/2005 to effect the Secret Deal;

g.  Numerous emails and telephone calls between SEC (Lemster) and Sapir in 2004/2005 to effect the Secret Deal while concealing it from Trasteco;

h. Numerous emails between SEC (Lemster) and/or Sapir with Trasteco (Svishchov) in 2004/2005 designed to induce Trasteco to enter into the contract with WG while concealing the Secret Deal.

**The Illegal Scheme Against Kisano**

80. Lemster and Sapir caused SEC and SLS to use the wires or US mails in furtherance of the Illegal Scheme, including the:

a. August 28, 2007, letter from WG to SEC memorializing the secret commission agreement;

b. October 26, 2007, email from Lemster to WG telling WG to set price at $128 per ton and "explain" the increased price is due to increased rail freight and loading costs, and setting secret commission at $5.00 per ton for Vessels 4 and 5, and $5.25 per ton for Vessels 6 through 10;

c. February 12, 2008, SEC Invoice for $368,160.21 to WG as $5 per ton commission on Vessel No. 2;

d. October 16, 2007, WG paid $361,371.95 to SEC as its $5 per ton commission for Vessel 1;

e. November 6, 2007 February 13, 2008, SEC wired a bribe of $249,101.90 to Sapir's account at LGT Bank Liechtenstein;

f. February 12, 2008, WG paid SEC $368,160.21 as its $5 per ton commission on Vessel 2;

g. February 13, 2008, SEC wired a bribe of $267,083 to Sapir's account at LGT Bank Liechtenstein;

h. Numerous emails and telephone calls between SEC (Lemster) and WG in 2007/2008 to effect the Kisano Secret Deal;

i. Numerous emails and telephone calls between SEC (Lemster) and Sapir in 2007/2008 to effect the Kisano Secret Deal while concealing it from Kisano;

j. Numerous emails between SEC (Lemster) and/or Sapir with Kisano (Svishchov) in 2007/2008 designed to induce Kisano to enter into the contract with WG while concealing the Kisano Secret Deal.

**The Illegal Scheme Against Plama**

81.     Lemster and Sapir caused SEC and SLS to use wires or US mails in furtherance of

the Illegal Scheme related to Plama, including:

    a.  Numerous emails and telephone calls between SEC (Lemster) and Williams in 2005 to effect the Plama Secret Deal;

    b.  Numerous emails and telephone calls between SEC (Lemster) and Sapir in 2005 to effect the Plama Secret Deal while concealing it from Plama;

    c.  Numerous emails between SEC (Lemster) and/or Sapir with Plama (Svishchov) in 2005 designed to induce Plama to enter into the contract with Williams while concealing the Plama Secret Deal.

    d.  September 26, 2005, Invoice from Sapir to SEC for his share of payments from WIS to SEC under the Plama Secret Deal;

    e.  September 27, 2005, emails between SEC and Sapir regarding payment of his share under the Plama Secret Deal;

    f.  October 31, 2005, email from WIS to SEC discussing increasing the price of Dismantling and Shipping Contracts by 15%;

    g.  November 9, 2005, Invoice from Sapir to SEC for his share of payments from WIS to SEC under the Plama Secret Deal;

    h.  September 26, 2005, $23,302.15 international bank wire to Sapir's account at Banco De Andalucia in Marbella, Spain;

    i.  November 9, 2005, $27,345.75 international bank wire to Sapir's account at Banco De Andalucia in Marbella, Spain;

    j.  September 27, 2006, $23,400 international wire to Sapir's account at Banque de Gestion De Rothschild in Monaco.

**The Illegal Scheme Related to Veolia**

82.     Lemster and Sapir caused SEC and SLS to use the wires or US mails in

furtherance of the Veolia Secret Deal, including:

    a.   Numerous emails and telephone calls between SEC (Lemster) and Veolia to negotiate and complete SEC's November 29, 2005 secret purchase of the Water Treatment Facility;

    b.   Emails dated April 4, 2006 between SEC (Lemster) and Veolia regarding their secret deal to spilt the sales price for the Water Treatment Facility above $375,000;

    c.   Numerous emails and telephone calls between SEC (Lemster) and Veolia in 2005/2006 to effect the Veolia Secret Deal;

    d.   Numerous emails and telephone calls between SEC (Lemster) and Sapir in 2005/2006 to effect the Veolia Secret Deal while concealing it from Bannai and Svishchov;

    e.   Numerous emails between SEC (Lemster) and/or Sapir with Bannai in 2005/2006 designed to induce Bannai to enter into the contract with Veolia while concealing the Veolia Secret Deal.

### Commercial Bribery

83.    The Illegal Scheme included acts of commercial bribery in violation of 18 Pa.C.S. §4108 which are punishable by a term of two years imprisonment.

84.    Upon information and belief, Lemster caused SEC to commit commercial bribery by paying Sapir to influence his decisions as the agent of Shulman in regard to the Warren Equipment Secret Profit as set forth above.

85.    Lemster caused SEC to commit commercial bribery by paying Sapir to influence his decisions as the agent of Trasteco and Kisano as set forth above, as well as Plama.

### Travel Act

86.    The Illegal Scheme included acts in violation of the Travel Act1(18 U.S.C. §1952), including in interstate and foreign travel and use of the mails by Lemster and Sapir in furtherance of bribery, including:

    a.   Lemster travelling between states in the United States to further the Warren Equipment Secret Profits in order to pay bribes;

    b.   Sapir travelling from outside the United State to the United States and between states in the United States to further the Warren Equipment Secret Profits in order to receive bribes;

    c.   upon information and belief, Lemster travelling to Switzerland to open his bank account which was used to pay bribes; and

    d.   upon information and belief, Sapir traveling to various countries, including Switzerland, Spain, Lichtenstein, and Monaco, to open bank accounts which were used to receive bribes.

## <u>COUNT I</u>

### VIOLATION OF RICO 18 U.S.C. §1962(c)
### Plaintiffs v. Lemster and Sapir

87.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth in full.

88.    Lemster and Sapir conducted and participated in the conduct of the affairs of the SEC and SLS enterprises through a pattern of racketeering activity which effected interstate and foreign commerce.

89.    The pattern of racketeering activity included mail fraud, wire fraud, bribery, and Travel Act violations as set forth above.

90.    As a direct and proximate cause of the above pattern of racketeering, Plaintiffs suffered damage in property and business, including, but not limited to:

    a.   Shulman paying an inflated amount in excess of $6 million related to the Warren Equipment;

    b.   Trasteco paying an inflated amount of at least the amount of the secret commission of $396,286 on the WG contract;

    c.   Kisano paying an inflated amount of at least the amount of the secret commission of $729,532.16 on the WG contract.

## COUNT II

### VIOLATION OF 18 U.S.C. §1962(d)

### Plaintiffs v. Lemster and Sapir

91.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth in full.

92.     Lemster and Sapir conspired with one another to violate §1962(d) in regard to the conduct and operation of the SEC and SLS which directly and proximately caused Plaintiffs to suffer damage in their property and business, as set forth above.

## COUNT III

### INTENTIONAL INFERENCE WITH CONTRACTS

### Kisano and Trasteco v. Lemster, SEC, and Sapir

93.     Trasteco and Kisano incorporate by reference all preceding paragraphs as if set forth in full.

94.     Defendants' conduct intentionally and improperly interfered in the Trasteco/W G and Kisano/WG coal sale contracts.

95.     Defendants' conduct increased the cost by the amount of the secret commissions.

96.     Defendants had no privilege or justification for securing and being paid on the Trasteco and Kisano Secret Deals.

97.     Defendants purposefully and intentionally interfered in the contractual relationship between Trasteco/WG and Kisano/WG by paying/receiving bribes so that Sapir would make recommendations and decisions contrary to the interests of Trasteco and Kisano.

## COUNT IV

## UNJUST ENRICHMENT

### Plaintiffs v. Lemster, SEC, and Sapir

98.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth in full.

99.     As a result of Defendants' conduct with regard to the Warren Equipment Secret Profit and Trasteco and Kisano Secret Deals, as set forth above, Defendants have been unjustly enriched in that they have obtained and retained the benefits of payments totaling in excess of $7million.

## COUNT V

## BREACH OF FIDUCIARY DUTY/

## IMPROPER USE OF CONFIDENTIAL INFORMATION AND RELATIONS

### Plaintiffs v. Lemster, SEC, and Sapir

100.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth in full.

101.    At all times relevant hereto, Defendants acted as the agents and fiduciary of Plaintiffs.

102.    As agents of Plaintiffs, Defendants owed duties of care, loyalty, good faith and candor. As detailed above, Defendants violated such duties by orchestrating and entering into the Warren Equipment Secret Profit and the Secret Deals; providing advice contrary to the interests of Plaintiffs but in the interests of Defendants; and paying/receiving bribes to compromise Sapir's duties and obligations.

103.    Plaintiffs suffered monetary damages by Defendants' conduct in the form of paying higher prices for the Warren Equipment or on contracts entered into with WG.

104.     Defendants are required to disgorge any secret profits or commissions which they made while serving as agents of Plaintiffs.

## COUNT VI

### FRAUD
### Shulman v. Lemster, SEC, and Sapir

105.     Shulman incorporates by reference all preceding paragraphs as if set out in full.

106.     Defendants knowingly and fraudulently misrepresented that the purchase price of the Warren Equipment was in excess of $6.6 million and, instead, that Shulman was required to pay in excess of an additional $5.4 million for the equipment as well as $500,000 for "consulting" for Stamp.

107.     Shulman reasonably relied on the Defendants representations and as a direct and proximate cause of such false representations wired over $5.9 million to the SEC/Lemster account in Switzerland.

## COUNT VII

### FRAUDULENT CONVEYANCE

### IN VIOLATION OF 12 PA.C.S.A. §5104 and §5105

### Plaintiffs v. Lemster, SEC, Sapir, and Sapir Entities

108.     Plaintiffs incorporate by reference all preceding paragraphs as if set out in full.

109.     The transfers made by Defendants to bank accounts outside of the United States, including, but not limited to, the transactions listed below were fraudulent in violation of Pennsylvania law and made with actual intent to hinder, delay or defraud the Plaintiffs as creditors of Defendants:

     a.  the transfers which Defendants requested that Shulman make to bank accounts of

        SEC/Lemster and Sapir related to the Warren Steel Equipment Fraud;

     b.  the transfers which SEC made to Sapir related to the Trasteco Secret Deal; and

     c.  the transfers which SEC made to Sapir related to the Kisano Secret Deal.

110.    Sapir maintains accounts outside of the U.S., which are designed to keep monies in these accounts from creditor, such as Plaintiffs, rendering Sapir insolvent to satisfy Plaintiffs' claims.

111.    Upon information and belief, SEC/Lemster maintain accounts outside of the U.S., as evidenced by Exhibit F, which are designed to keep the money in these accounts from creditors such as Plaintiffs, rendering them insolvent to satisfy Plaintiffs' claims.

112.    Upon information and belief, SEC/Lemster and/or Sapir transferred funds received from the wrongdoing pled above to the Sapir Entities.

113.    Plaintiffs seek recovery of these funds or their proceeds.

WHEREFORE, Plaintiffs request relief as follows:

     a.  Compensatory damages in excess of $7 million;

     b.  Disgorgement of all secret profits, fees, and commissions;

     c.  Injunctive relief providing for tracing, accounting, and attachment of all funds or their proceeds which Plaintiffs paid Defendants pursuant to the Warren Equipment Secret Profits or Defendants received pursuant to the Trasteco Secret Deal and the Kisano Secret Deal;

     d.  Treble damages under RICO, plus costs and attorney fees;

     e.  Such other relief which is just and equitable.

MARKS & SOKOLOV, LLC

By: */s/Bruce S. Marks*

   Bruce S. Marks, Esquire
   Thomas Sullivan, Esquire
   Marks & Sokolov, LLC
   1835 Market Street 28th Floor
   Philadelphia, Pennsylvania 19103
   Marks@mslegal.com
   (215) 569-8901


BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.


By: */s/Kevin K. Douglass*
   Kevin K. Douglass, Esquire (PA ID 47748)
   Two Gateway Center, 6th Floor
   Pittsburgh, Pennsylvania 15222
   kdouglass@babstcalland.com
   (412) 394-5400

Dated: May 11, 2012     Counsel for the Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Amended Complaint was this 11th day of May, 2012, served via the Court's CM/ECF system, which will send notice of such filing to all attorneys of record.


 /s/  Kevin K. Douglass
Kevin K. Douglass