IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KISANO TRADE & INVEST LIMITED, | ) | |
| TRASTECO, LTD., and VADIM SHULMAN, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs | ) | Civil Action No.  11-852 |
| | ) | Judge Conti |
| DEV LEMSTER, STEEL EQUIPMENT CORP., | ) | Magistrate Judge Mitchell |
| AKIVA SAPIR, and SAPIR ENTITIES 1-100, | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion to dismiss on the grounds of forum non

conveniens (ECF No. 115) filed on behalf of defendant Akiva Sapir, be granted.

II.    Report

Plaintiffs, Kisano Trade & Invest Limited ("Kisano"), Trasteco, Ltd. ("Trasteco"), and

Vadim Shulman ("Shulman"), bring this action under the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961-68 (RICO), and state law against the Defendants, Dev

Lemster ("Lemster"), Steel Equipment Corporation ("SEC"), Akiva Sapir ("Sapir") and Sapir

Entities 1-100.  The Complaint alleges that Defendants engaged in at least six acts of fraud and

secret deals through a pattern of related predicate acts of racketeering designed to defraud five

principles for which Sapir served as agent – Shulman and Kisano, Trasteco, Plama, Ltd.

("Plama"), and Warren Steel Holdings, Inc. ("Warren Steel"), which were managed by George

Svishchov ("Svishchov") on behalf of Shulman.

Currently pending before the Court is a motion filed by Sapir.  He requests that the

complaint be dismissed based on the doctrine of forum non conveniens on the basis that it could

be filed in Israel, where it more properly belongs. For the reasons that follow, the motion should be granted and this case should be dismissed with the understanding that it can be refiled in Israel.

Facts

Kisano is a corporation organized under the laws of the Republic of Cyprus. (Am. Compl. ¶ 6.)[1] Trasteco is a limited liability company organized under the laws of Malta (Am. Compl. ¶ 7.) Shulman is a citizen of Israel. (Am. Compl. ¶ 8.) Svischov is a citizen of Ukraine who assisted Trasteco, Kisano and Shulman in the business dealings at issue. (Am. Compl. ¶ 10.) SEC is a Pennsylvania corporation with a principal place of business in Pittsburgh, Pennsylvania. SEC buys and sells used steel-making equipment and provides advisory, appraisal and consulting services. It is owned by Lemster, a citizen of Pennsylvania. (Am. Compl. ¶¶ 11-12.) Sapir is a citizen of Israel. (Am. Compl. ¶ 13.) Sapir Entities 1-100 are entities, identity unknown, owned or controlled by Sapir which allegedly received funds from the acts alleged in the Amended Complaint. (Am. Compl. ¶ 14.)

Plaintiffs allege that Defendants engaged in six acts of fraud as follows:

The Warren Equipment Fraud

In 2001, Sapir assisted Shulman in acquiring a steel facility in Warren, Ohio owned by Copperweld Steel Corp. ("CSC") in bankruptcy. Shulman appointed Sapir as his agent to acquire the plant (the "Warren Plant") and equipment (the "Warren Equipment"). Sapir arranged for Eckert Seaman's Pittsburgh office to handle the transactions. The Warren Plant was acquired from CSC by Warren Steel Holdings, LLC, incorporated by Eckert, for Shulman. (Am. Compl. ¶¶ 19-22.)

---

[1] ECF No. 47.

Sapir, as Shulman's agent, purchased the Warren Equipment from CSC. Shulman alleges that Sapir led Shulman to believe the purchase price was approximately $13 million. In October, 2001, Shulman wired $500,000 to Sapir for an alleged down-payment on the Warren Equipment to a UBS account, and then $6.6 million to Eckert in Pittsburgh, which paid $6 million to the seller of the equipment and $600,000 to the broker. (Am. Compl. ¶¶ 20-26, 78 & Ex. F.)

In October, 2001, Sapir sent two memorandum faxes dated October 28, 2001 from area code 412 (i.e. Pittsburgh) to Shulman, explaining that Shulman needed to wire $500,000 to a Credit Suisse account "for the service that we got from Mr. Bob Stamp (helping us get the purchase price we wanted)" for the Warren Equipment, and for the balance of the purchase price, to make six payments of approximately $908,000 each to SEC "for the financing of the purchase" of the Warren Equipment. This fax stated "Steel equipment Corp will provide me in the next few days full wire instructions." (Am. Comp. ¶¶ 23-25, 78 & Ex. F.)

On November 6, 2001 a fax on the letterhead of SEC was sent to Shulman instructing that four payments be made to what appeared to be SEC's Credit Suisse account "re: Lemster" and two payments be made to SEC's account in this District. In 2001 and early 2002, Shulman made the $500,000 down payment, the $500,000 for Stump, and the six $908,000 payments. (Am. Compl. ¶¶ 22-26, 78(b), (d) & Ex. F.) Shulman alleges that, unbeknownst to him, $6.6 million was the full price of the Warren Equipment and Sapir kept the $500,000 down payment, $500,000 for Stamp, and the six $908,000 payments. Plaintiffs allege that Sapir obtained secret profits of approximately $6.4 million. (Am. Compl. ¶¶ 23-26, 78(b), (d), (f).) Lemster/SEC received a $22,000 "commission" for "processing" each of the two $908,000 payments through SEC's Pennsylvania account to Sapir's account at Credit Suisse. (Temkin Decl. ¶ 22 & Ex. 13.)[2]

---

[2] ECF No. 138-2.

### The Trasteco Secret Deal

In 2004, Trasteco contracted with West Virginia based Winding Gulf, LLC ("Winding Gulf") to purchase 120,000 metric tons of metallurgical coal at $120 per ton to ship to Ukraine. Shulman alleges that Winding Gulf entered into a secret agreement to pay SEC $2 per ton as Trasteco's "buyer's agent" and Winding Gulf increased the prices to cover its commission. SEC received a secret commission of $260,000 and Sapir secretly received $130,000 of this amount. (Am. Compl. ¶¶ 29-37, 79(e).)

### The Kisano Secret Deal

In 2007, Kisano contracted with Winding Gulf to purchase 2 vessels of coal at $117.50 per ton. Kisano amended the agreement adding eight more vessels of coal for up to $128 per ton. Shulman alleges that Winding Gulf entered into a secret agreement to pay SEC $5 per ton as Kisano's "buyer's agent" and Winding Gulf increased the prices to cover the commission. SEC received a secret commission of $729,532.16 and Sapir received $516,184.90 of this amount. (Am. Compl. ¶¶ 38-46, 80, 95.)

### The Plama Secret Deal

In August 2005, Plama contracted with Pennsylvania based Williams Industrial Services, Inc. ("WIS") to dismantle the Warren Plant for $6,230,750.  In September 2005, Plama contracted with WIS to ship dismantled equipment to Ukraine for $3,646,100.  Plaintiffs allege that, unbeknownst to Plama, WIS had a secret deal to pay SEC a 15% commission.  WIS charged Plama a higher price to cover the commission. SEC received a secret commission of $183,773.01 and Sapir received $50,647.90 of this amount.  (Am. Compl. ¶¶ 48-61, 81, 95.)

### The Veolia Secret Deal

After cancellation of the WIS contracts, it was decided to reopen the Warren Plant.

Plaintiffs allege, however, that SEC and Veolia, a company that owned an adjacent water treatment plant, secretly agreed to split 50/50 any amounts over a $375,000 sale price to the Warren Plant. SEC/Lemster then encouraged the then manager of the Warren Plant to pay $650,000 for the plant; Veolia and SEC split the $275,000 gain. SEC secretly received a profit of $137,500 and Sapir received $23,400 of this amount. (Am. Compl. ¶¶ 65-69.)

The N.Y. Real Estate Fraud

In 2005, Shulman appointed Sapir as his agent to acquire real estate in New York. The understanding was Shulman would provide 80% of the financing and Sapir would provide 20%. Sapir again engaged Peter Baggerman of Eckert's Pittsburgh office and New York attorney Lawrence Drath to represent Shulman's interests. In 2005, Shulman wired over $27 million to Eckert's escrow account in Pittsburgh to purchase three real estate properties, i.e. 113 Christopher Street, 65 Bank Street, and 107 Christopher Street in New York City (the "N.Y. Real Estate"). (Pls.' Am. RICO Statement at 10-11.)[3]

Shulman believed he was wiring 80% of the costs of the N.Y. Real Estate and Sapir was investing 20%. In 2008, Sapir sold 113 Christopher Street for $6.15 million and kept the proceeds. Shulman believed Sapir was repaying himself the 20% which he invested. In 2011, Shulman learned only his monies were used to purchase the N.Y. Real Estate; thus, he alleges that Sapir took $6.15 million belonging to Shulman. (Am. RICO Statement at 11.) Numerous predicate acts of racketing were involved related to 113 Christopher Street, including (a) wires (emails, telephone calls) regarding its acquisition; (b) wires of $700,000, $60,000, and $4,980,000 for its acquisition; and (c) the wire to Sapir for $6.15 million from its sale. (Am. RICO Statement at 20.)

---

[3] ECF No. 93.

<u>Procedural History</u>

Kisano and Trasteco originally filed their complaint against Lemster and SEC on June 28, 2011. The Amended Complaint was filed by Kisano, Trasteco and Shulman on May 11, 2012 (ECF No. 47), naming as defendants Lemster, SEC, Sapir and the Sapir Entities. Federal question jurisdiction, 28 U.S.C. §§ 1331, 1337(a) and 18 U.S.C. § 1964(c), is invoked for the RICO claims in Counts I and II (Am. Comp. ¶ 4).[4] Count I alleges that Lemster and Sapir violated RICO § 1962(c) by conducting the affairs of SEC through a pattern of racketeering activity, specifically by engaging in acts of mail fraud, wire fraud and bribery, which caused injury to Trasteco in its 2004 contract with Winding Gulf and to Kisano in its 2007 contract with WG. Count II alleges that Lemster and Sapir conspired with one another to violate 18 U.S.C. § 1962(d). Count III alleges that Lemster, SEC and Sapir intentionally interfered with the contracts between Winding Gulf and Trasteco and Kisano. Count IV alleges that Lemster, SEC and Sapir were unjustly enriched by their actions. Count V alleges that Lemster, SEC and Sapir breached their fiduciary duties and improperly used confidential information and relations. Count VI alleges that Lemster, SEC and Sapir committed acts of fraud. Count VII alleges that all Defendants made fraudulent conveyances in violation of 12 Pa. C.S. §§ 5104 and 5105.

On August 27, 2012, Sapir filed a motion to dismiss on the grounds of forum non conveniens (ECF No. 115).[5] Shulman submitted a response on November 6, 2012 (ECF No.

---

[4] Although not expressly stated, supplemental jurisdiction, 28 U.S.C. § 1367(a), is presumably the basis for the state law claims in Counts III-VII because they "form part of the same case or controversy" as the federal claims.

[5] On that same date, he also filed a motion to dismiss for failure to state a claim under Rule 12(b)(1) and 12(b)(6) (ECF No. 117). That motion has also been fully briefed. However, the Supreme Court has held that courts have discretion to decide the order in which they address threshold issues. <u>Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.</u>, 549 U.S. 422 (2007). The Court should first address whether a foreign tribunal is plainly the more suitable arbiter of the merits of this case. Because the forum non conveniens motion should be granted, the motion to

138). Sapir filed a reply brief on November 30, 2012 (ECF No. 144).[6]

Standard of Review

The Supreme Court has explained that:

> A federal court has discretion to dismiss a case on the ground *of forum non conveniens* "when an alternative forum has jurisdiction to hear [the] case, and ... trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience, or ... the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." American Dredging Co. v. Miller, 510 U.S. 443, 447–448, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), in turn quoting Koster v. (American) Lumbermens Mut. Casualty Co., 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)). Dismissal for *forum non conveniens* reflects a court's assessment of a "range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 723, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (citations omitted). We have characterized *forum non conveniens* as, essentially, "a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined." American Dredging, 510 U.S., at 453, 114 S.Ct. 981; cf. In re Papandreou, 139 F.3d [247,] 255 [(D.C. Cir. 1998)] (*forum non conveniens* "involves a deliberate abstention from the exercise of jurisdiction").

Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 429-30 (2007).

Forum non conveniens is a non-merits ground for dismissal; "it is a determination that the merits should be adjudicated elsewhere." Id. at 432 (citations omitted).

The Court of Appeals for the Third Circuit has set forth the procedure for evaluating a forum non conveniens motion as follows:

> "[W]hen considering a motion to dismiss on *forum non conveniens* grounds, a district court must first determine whether an adequate alternate forum can entertain the case." If an adequate alternative forum exists, the district court must determine next the appropriate amount of deference to be given the plaintiff's choice of forum. After the district court has determined the amount of

---

dismiss on other grounds can be addressed in Israel.

[6] Sapir has requested oral argument, but upon review, the Court concludes that oral argument is not necessary to resolve this motion.

deference due to the plaintiff's choice of forum, the district court must balance the relevant public and private interest factors. "If the balance of these factors indicates that trial in the chosen forum would result in oppression or vexation to the defendant out of all proportion to the plaintiff's convenience, the district court may, in its discretion, dismiss the case on *forum non conveniens* grounds."

Eurofins Pharma US Holdings v. BioAlliance Pharma SA, 623 F.3d 147, 160 (3d Cir. 2010)

(quoting Windt v. Qwest Comms. Int'l, Inc., 529 F.3d 183, 189, 190 (3d Cir. 2008) (internal

citations omitted), cert denied, 555 U.S. 1098 (2009)).

Sapir contends that Israel is an adequate alternative forum that has jurisdiction to hear the

case, that Shulman's choice of this forum is entitled to reduced deference because he is a foreign

plaintiff, and that balancing the relevant public and private factors demonstrates that trial in this

forum would establish oppressiveness and vexation to him out of all proportion to Shulman's

convenience. Shulman responds that Israel is an inadequate alternative forum, that his choice of

forum is entitled to the equivalent of the deference provided to a United States citizen because of

a treaty between the United States and Israel, and that when the factors are properly weighed,

there is no basis for concluding that trial in this forum would establish oppressiveness and

vexation to Sapir.

> Whether Israel is an Adequate Alternative Forum

The Court of Appeal has stated that:

> The requirement of an adequate alternative forum is generally satisfied "when the defendant is 'amenable to process' in the other jurisdiction." Piper [Aircraft], 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22 (citation omitted). Occasionally, however, if the alternative forum offers a clearly unsatisfactory remedy, it will nonetheless be inadequate. The latter situation arises, for instance, when the subject matter of the suit is not cognizable in the alternative forum. Id. at 254 n. 22, 102 S.Ct. at 265 n. 22.

Lacey v. Cessna Aircraft Co., 932 F.2d 170, 180 (3d Cir. 1991) (footnote omitted). See Auxer v.

Alcoa, Inc., 2010 WL 1337725, at*7 (W.D. Pa. Mar. 29, 2010) (Cercone, J.), aff'd, 406 Fed.

Appx. 600 (3d Cir. 2011).

Sapir is an Israeli citizen; he indicates that he is subject to the jurisdiction of the Israeli

courts.  (Sapir FNC Decl. ¶ 6; Weinroth Decl. ¶¶ 17-19.)[7]  He further states that Israeli courts

have a mechanism for joining parties such as Lemster and SEC (Weinroth Decl. ¶ 21) and that

those parties have voluntarily agreed to the jurisdiction of the Israeli courts for the matters that

are the subject of this case (Lemster Decl. ¶ 4.)[8]  Thus, he contends that all defendants are

amenable to process in Israel and that Plaintiffs could access that court system to assert claims

against them, so Israel is an adequate alternative forum.  He also notes that Israel is already the

forum for a dispute between him and Shulman (Sapir FNC Decl. ¶ 51 & Ex. 5.)

Shulman disputes that SEC and Lemster are subject to process in Israel.  However, Sapir

has proffered the declaration of Jacob Weinroth, an Israeli lawyer, who states that Israeli courts

have a procedure that could be used to serve process on SEC and Lemster and/or that they can

voluntarily consent to jurisdiction, in which case the Israeli courts can obtain jurisdiction over

them.  As noted, they have also consented to jurisdiction in Israel.  Shulman has cited no law or

evidence to the contrary.  Rather, he criticizes their willingness to consent to jurisdiction in Israel

as "reverse forum shopping."  However, the Supreme Court has stated that:

> this possibility ordinarily should not enter into a trial court's analysis of the
> private interests.  If the defendant is able to overcome the presumption in favor of
> plaintiff by showing that trial in the chosen forum would be unnecessarily
> burdensome, dismissal is appropriate—regardless of the fact that defendant may
> also be motivated by a desire to obtain a more favorable forum.

Piper Aircraft, 454 U.S. at 252 n.19.

In fact, courts routinely condition the granting of a forum non conveniens motion upon

the defendants' willingness to consent to jurisdiction in the alternate forum.  See Miller v.

---

[7] ECF No. 119 Exs. A, E.
[8] ECF No. 119 Ex. B.

Boston Scientific Corp., 380 F. Supp. 2d 443, 448 (D.N.J. 2005) (citing cases). Shulman's counsel is certainly aware of this point of law. See Base Metal Trading SA v. Russian Aluminum, 253 F. Supp. 2d 681, 698 (S.D.N.Y. 2003) (case where plaintiffs were represented by, inter alia, Marks & Sokolov, who represent Plaintiffs her, the court noted that all 20 defendants explicitly consented to jurisdiction in Russian courts, thus making it an "available" alternative forum), aff'd, 98 Fed. Appx. 47 (2d Cir. 2004). Therefore, this Court concludes that SEC and Lemster are subject to process in Israel.[9]

The next issue is whether Israeli law provides causes of action that would allow Plaintiffs to seek redress based on the conduct alleged in the Amended Complaint. Sapir indicates that Israel has causes of action for fraud, breach of an agency relationship and improper use of confidential information. (Weinroth Decl. ¶¶ 26-28.) He further submits that, although Israel does not have an equivalent to RICO, it does provide causes of action for the predicate acts of RICO claims. (Weinroth Decl. ¶ 29.) Finally, he argues that lack of a precise matching cause of action for RICO has been held to be no bar to dismissal on the grounds of forum non conveniens. Windt, 529 F.3d at 193; Stroitelstvo Bulgaria Ltd. v. Bulgarian-American Enterprise Fund, 589 F.3d 417, 422 (7th Cir. 2009) (noting that RICO is a "uniquely American effort to target organized crime"). Sapir notes that a number of United States courts have found Israel to be an adequate alternative forum in a forum non conveniens analysis. See Wilson v. Eckhaus, 349 Fed. Appx. 649 (2d Cir. 2009); Miller v. Boston Scientific Corp., 380 F. Supp. 2d at 448. In Wilson, the court specifically rejected the argument that the unavailability of RICO in Israel rendered it an inadequate alternative forum. Wilson v. ImageSat Int'l, N.V. 2008 WL 2851511,

---

[9] Lemster has also indicated that neither he nor SEC will raise any statute of limitations defense not previously available to them if this action is dismissed and refiled in Israel within one year from the date of dismissal. (Lemster Decl. II ¶ 4) (Sapir Reply Br. (ECF No. 144) Ex. A.)

at *6 (S.D.N.Y. July 22, 2008), <u>aff'd</u>, 349 Fed. Appx. 649 (2d Cir. 2009).

Shulman does not dispute these assertions. The Court concludes that Israeli law provides sufficient causes of action that would allow Plaintiffs to seek redress based on the conduct alleged in the Amended Complaint and that the lack of a precise counterpart to RICO does not alter that conclusion. Therefore, Israel represents an adequate alternative forum.

<u>Amount of Deference Owed to Shulman's Choice of Forum</u>

Sapir argues that, as a foreign plaintiff, Shulman receives a lesser amount of deference in his choice of forum. Shulman responds that, because of a treaty between the United States and Israel, he is entitled to the same amount of deference as that provided to a United States citizen.

The Court of Appeals has stated that:

> Ordinarily, a strong presumption of convenience exists in favor of a domestic plaintiff's chosen forum, and this presumption may be overcome only when the balance of the public and private interests clearly favors an alternate forum. <u>Piper Aircraft Co.</u>, 454 U.S. at 255, 102 S.Ct. 252. "When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." <u>Id.</u> at 256, 102 S.Ct. 252. Foreign plaintiffs, however, may bolster the amount of deference due their choice by making a strong showing of convenience. Thus, in performing its forum non conveniens inquiry in a case filed by a foreign plaintiff, the "district court must assess [, and articulate,] whether the considerable evidence of convenience has ... overcome any reason to refrain from extending full deference to the foreign plaintiff's choice."

<u>Windt</u>, 529 F.3d at 190 (quoting <u>Lony v. E.I. du Pont de Nemours & Co.</u>, 886 F.2d 628, 634 (3d Cir. 1989)). In <u>Windt</u>, the court afforded the plaintiffs (Dutch attorneys appointed as trustees) a low degree of deference when they chose New Jersey as the forum, because it was not the home forum of all defendants and there was no indication that a substantial amount of conduct giving rise to the dispute occurred there.

Shulman contends that "when a treaty with a foreign nation accords its nationals access to

our courts equivalent to that provided American citizens, identical forum non conveniens standards must be applied to such nationals by American courts." <u>Blanco v. Banco Industrial de Venezuela, S.A.</u>, 997 F.2d 974, 981 (2d Cir. 1993). He cites the Treaty of Friendship, Commerce and Navigation entered into by the United States and Israel on August 23, 1951, which states that:

> Nationals and companies of either Party shall be accorded national treatment and most-favored-nation treatment with respect to access to the courts of justice and to administrative tribunals and agencies within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights.

(Temkin Decl. ¶ 18 & Ex. 9 Art. V(1).) Based on this treaty, he asserts that he is entitled to be treated as a U.S. citizen with respect to his choice of forum.

In his reply brief, Sapir contends that the <u>Blanco</u> case does not goes as far as Shulman proposes, citing a more recent case which stated that "our case law does not support plaintiffs' assertion that such a treaty would require that their choice of forum be afforded the same deference afforded to a U.S. citizen bringing suit in his or her home forum." <u>Pollux Holding Ltd. v. Chase Manhattan Bank</u>, 329 F.3d 64, 73 (2d Cir. 2003). Rather, the court held, the plaintiffs "are only entitled, at best, to the lesser deference afforded a U.S. citizen living abroad who sues in a U.S. forum." <u>Id.</u>

However, the Court need not resolve any tension which might exist between <u>Pollux</u> and <u>Blanco</u>, or the cases cited therein, because all of these cases are from the Second Circuit. Shulman has not cited any authority suggesting that the Third Circuit would adopt a similar rule. Moreover, it is noted that the Supreme Court has not recognized this exception to the exception. <u>See</u> <u>Sinochem</u>, 549 U.S. at 430 ("When the plaintiff's choice is not its home forum … the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate in such cases is 'less reasonable.'") This Court concludes that the rule is as

stated in <u>Windt</u>: as a foreign plaintiff, Shulman is entitled to less deference than a U.S. citizen unless he makes a strong showing of convenience.

Shulman has not made a strong showing of convenience. To review, Shulman is an Israeli citizen, Kisano is a Cypriot corporation, Trasteco is a Maltese LLC, and Svischov is a Ukrainian citizen. Shulman states that:

> I am a businessman with dealings in the United States. My United States dealings include (a) the transactions regarding the Warren Plant and the Warren Equipment in 2001-2002; (b) purchasing coal from Winding Gulf in 2004 to 2008; and (c) purchasing real estate in New York in 2005 (which I sold in 2011). I am still a 33.3% beneficial owner of Warren Steel Holdings, Ltd. ("Warren Steel") although I do not serve [as] a director and am not involved in management. Warren Steel invested over $100 million in redeveloping the steel plant and I believe it employs over one hundred persons. In addition, I currently have an investment in a non-public genetics research company in California and hope to join its board of directors this fall. Thus, it is fair to say I have substantial interests in America.

(Shulman Decl. ¶ 9.)[10] However, as Sapir observes, most of these dealings do not involve this forum (Pennsylvania), but rather Ohio, New York and California.

Shulman states that Lemster and SEC are Pennsylvania citizens, but they have consented to litigate this case in Israel. He further states that:

> numerous activities relevant to the new "Warren Equipment Fraud" claims took place in Pennsylvania and the United States, including (a) Lemster and SEC being Pennsylvania residents; (b) the two faxes and the "Bill of Sale" being sent by Sapir from Pennsylvania as evidenced by the "412" in the transmission; and (c) two of the $908,000 payments for "financing" the Warren Equipment purchase being wired to SEC's bank account in Pennsylvania. In addition, I paid the fees for the Eckert firm's Pittsburgh office to handle the transactions involving the purchase of the Warren Plant by Warren Steel Holdings, Inc. and Warren Equipment by Sapir.

> Third, numerous witnesses relevant to the new Warren Equipment Fraud claims reside in Pennsylvania or the United States, including (a) Lemster; (b) Bob Stump; and (c) Scott Cessar (the attorney at Eckert whose fees I paid to handle the transaction).

---

[10] ECF No. 138-1.

(Shulman Decl. ¶¶ 20-21.)[11]  Finally, he asserts that Bruce Marks and the law firm of Marks &

Sokolov have invested thousands of hours learning about the transactions at issue, that they

uncovered the Warren Equipment Fraud, and that they speak Russian.  He asserts that, if forced

to litigate this case in Israel, he would be required to engage new counsel with no familiarity

with these matters, the documents would have to be translated from English into Hebrew, and he

would need to find Israeli attorneys who speak Russian and English so they could work with Mr.

Marks and him, all of which would impose a significant financial burden.  (Shulman Decl. ¶¶ 23-

25.)

Sapir responds that the relevant negotiations regarding the Warren Equipment sale

occurred primarily in Israel with at least one of the parties in Israel and that any agreement

between them which would form the basis of subsequent purchases of equipment and coal by

Sapir originated in Israel.  (Sapir Decl. IV ¶¶ 11-12, 55;[12] Abraham Sapir Decl. ¶ 8.[13])  He also

notes that Shulman does not even allege that they formed the alleged agency relationship in the

United States or that they engaged in negotiations or formed any agreements here.  In addition,

the level of deference depends on the plaintiff's connections with the forum, not that of the

defendants.  See Pollux, 439 F.3d at 74 ("a plaintiff's choice to initiate suit in the defendant's

home forum-as opposed to any other where the defendant is also amenable to suit-only merits

heightened deference to the extent that the plaintiff and the case possess *bona fide* connections

to, and convenience factors favor, that forum.")  Thus, the fact that this forum is home to

---

[11] It is noted that Shulman cites Lemster's Pennsylvania residency three separate times in his
declaration, but it counts as a factor only once.

[12] ECF No. 144 Ex. B.  The declaration is designated as Sapir's fourth because he submitted two
declarations in connection with Shulman's motion for TRO/preliminary injunction (ECF Nos.
66, 85).  The declaration he submitted with the pending motion (designated "Sapir FNC Decl.")
is his third.

[13] ECF No. 144 Ex. C.

Lemster and SEC is not a significant factor unless Shulman and this case possess bona fide connections to this forum and convenience fact favors it. For all of the reasons described herein, those connections are lacking here.

Finally, the convenience of a plaintiff's counsel is not a relevant factor in the analysis. See Miller, 380 F. Supp. 2d at 450. In addition, Weinroth explains that foreign lawyers may consult with their clients and Israeli counsel where appropriate. (Weinroth Decl. II ¶ 4.)[14] Shulman's choice of this forum is entitled to a low degree of deference.

Evaluation of Private Factors

The private factors to be evaluated include:

the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Eurofins, 623 F.3d at 161 (citing Gulf Oil Co. v. Gilbert, 330 U.S. 501, 508 (1947)).

Sapir argues that the relative ease of access to sources of proof is "[o]ne of the most significant factors" that the Court considers. Auxer, 2010 WL 1337725, at *9. It is not essential that all of the potential witnesses reside in the alternate forum, but defendants present a stronger case for dismissal on forum non conveniens grounds when the logistics of obtaining testimony from witnesses are less in the alternate forum. Eurofins, 623 F.3d at 162; Windt, 529 F.3d at 194.

Sapir and Shulman will be key witnesses in this matter. Sapir contends that Shulman could not appear in this Court because his visa to the United States has been revoked. (Sapir FNC Decl. ¶ 20) and that his counsel has previously stated that it would be a "severe burden" for

---

[14] ECF No. 144 Ex. K.

him to appear before a United States court (Sapir FNC Decl. ¶ 22.)  However, Shulman has submitted a declaration in which he explains that his visa matter has been resolved and that he has a visa to travel to the United States valid from September 29, 2010 to September 27, 2020, and in fact he traveled here in April/May 2012.  (Shulman Decl. ¶¶ 3-4.)  Moreover, his counsel has indicated that, after submitting his declaration in September 2012, Shulman in fact visited the United States again in October 2012.  (Temkin Decl. ¶ 17.)  Shulman further explains that the objection cited by Sapir appeared in a motion to dismiss on the grounds of lack of personal jurisdiction in response to a suit filed against him in West Virginia, because he had no business dealings there and he considered it an unfair burden to defend claims against him in English, a language he does not speak.  (Shulman Decl. ¶ 35.) Thus, Sapir has not demonstrated that Shulman could not appear in this Court.

The more difficult question concerns Sapir's ability to appear.  Sapir asserts that he has antiphospholipid syndrome (APS), a serious blood clotting disorder that would be exacerbated by the long flight to the United States and he indicates that, Jacob Luboshitz a specialist who has been treating him for this disorder since 2006, stated in April 2012 that he should limit his flights to 3-4 hours for a year.  In June 2012, Dr. Luboshitz stated that Sapir should not fly at all for one year.  He states that he could not take the flight from Israel to the United States, which lasts approximately fourteen hours, and that his inability to appear in this Court would prejudice his ability to defend this action.  (Sapir FNC Decl. ¶¶ 9-13 & Ex. 1; Sapir Decl. IV ¶ 52; Luboshitz Decl. ¶¶ 7-8 & Exs. 2-3, 5.[15])

Shulman challenges Sapir's representations.  First, he questions the reports from Dr. Luboshitz as lacking in reliability because no diagnostic testing was performed in September

---

[15] ECF No. 144 Ex. J.

2012, thereby suggesting that Sapir's condition has not significantly changed since December 2011. (Varon Decl. ¶ 9.)[16] Shulman contends that Dr. Luboshitz's August 15, 2012 letter should be disregarded because: 1) it has not been authenticated pursuant to Federal Rule of Evidence 901(a); 2) it is hearsay not subject to the Federal Rule of Evidence 803(6) business record exception because it was not made contemporaneous with an examination or in the course of regularly conducted business activity; and 3) it is not a declaration made under penalty of perjury pursuant to 28 U.S.C. § 1746.

After Dr. Luboshitz refused to be deposed, Shulman had Sapir examined in Israel by another doctor, David Varon. Dr. Varon does not conclude that Sapir does not have APS or the thrombosis events as reported. However, he states that:

> Upon physical examination, Mr. Sapir is a 37 year male who appeared in generally good physical condition. He was wearing an elastic sock on his legs. There was no difference in the circumference of the calves, arterial pulse was normal, there was no visible redness or edema in the legs, and no apparent evidence of venous insufficiency. Such evidence includes increased circumference, signs of collateral or varicose veins, stasis dermatitis etc., all of which are indicating disturbed venous blood return from the affected limb. There were minor signs in the right foot of small broken vessels suggesting earlier event of deep vein thrombosis.

(Varon Decl. ¶ 7.) Dr. Varon concludes as follows:

> In my view, one would not conclude that any air travel would be prohibited, let alone short trips of four hours of less referenced in the April letter. The August 2012 letter and October 2012 summary do not reflect contemporaneous examinations of Mr. Sapir. I have never seen any studies that concluded waiting at airports causes problems, as set forth in the October 2012 summary. The April, June and August letters, and October summary, in my view should not be considered as medical records, but rather as statements of the doctor's view on the subject.

> Based upon my review of the records provided and physical examination of Mr. Sapir, I have been unable to find a venous insufficiency or other present objective indications of a medical condition that would prevent Mr. Sapir from air

---

[16] Temkin Decl. Ex. 14.

travel of 6 hours (or more) provided he continues his current course of medication, i.e. Coumadin, as well as having the elastic stockings.  In conclusion, based upon my examination of Sapir and review of the records, it is my professional opinion within a reasonable degree of medical certainty that Sapir can undertake air travel of 6 hours or more and can travel from Israel to the United States, breaking the trip into shorter legs as desired.

(Varon Decl. ¶¶ 10-11.)  In addition, Shulman has submitted a report from Dr. Marc Alpert, a physician in the United States, who reviewed Dr. Luboshitz's letters and medical summary and concluded that "Dr. Luboshitz lacks a proper medical basis for restricting Mr. Sapir's air travel." (Temkin Decl. Ex. 15 at 3.)

Picking up on Dr. Varon's suggestion, Shulman also proposes that, even if Sapir cannot take a direct flight from Israel to the United States, there are several other options available to him, including taking a series of shorter flights and train trips.  (Temkin Decl. ¶¶ 15-16, 27 & Exs. 7, 8, 18.)

Attached to Sapir's reply brief is the declaration of Dr. Luboshitz, which he signed on November 27, 2012 because he was greatly offended by the doubts expressed by Varon and Alpert concerning his medical recommendations for Sapir.  He states that: 1) all of the medical treatment and the writing of letters was performed in the context of his activities in public medicine, as part of his position with the Ministry of Health, and he has not and will not receive any form of remuneration for the letters he wrote for Sapir; 2) he wrote letters to Sapir's family doctor as a matter of his usual practice, to coordinate care and keep the family doctor informed; 3) he wrote the letter dated October 11, 2012 to correct inaccuracies in his letter of August 15, 2012, which was written without reviewing his notes and to clarify that he did not request any additional testing in the year 2012 because he felt that such testing was unnecessary and would only have caused problems for Sapir when he attempted to have them covered by insurance; 4) there is no question that Sapir has APS and has suffered DVTs and that he falls within the

highest risk category for suffering a recurring pulmonary embolism even during treatment with anti-coagulation drugs, defined as Triple APS; 5) he continues to hold the medical opinion that Sapir should abstain from any flights until June of 2013 and considers it very likely that, when he reevaluates Sapir at that time, he will extend the prohibition on flights for at least another year; and 6) this recommendation was adopted unanimously by the attending medical staff members at the Thrombosis and Haemostasis Clinic. (Luboshitz Decl. ¶¶ 5-14 & Exs. 4-5; Sapir Decl. IV ¶¶ 51, 54 & Ex. 10.) He further states that the alternative travel arrangements suggested by Shulman's representatives are unacceptable, as the splitting of flights would lead to the prolonging of Sapir's stay in conditions of dryness and hypoxia and that they would involve weeks of travel and long periods of stress and confinement that would present unacceptable risks to Sapir's health. (Luboshitz Decl. ¶¶ 33-34.)[17]

As an initial matter, the Court observes that Shulman has cited no authority indicating that the evidence to be considered on a motion to dismiss on the grounds of forum non conveniens must be admissible[18] and this Court's legal research suggests the opposite is true. As a general matter, the Supreme Court has observed that "the district court's inquiry does not necessarily require extensive investigation, and may be resolved on affidavits presented by the parties." Van Cauwenberghe v. Biard, 486 U.S. 517, 529 (1988).

More specifically, at least one court has explicitly rejected the argument that a court is limited to examining admissible evidence to resolve a motion to dismiss on the grounds of forum non conveniens. See Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1134, 1143 n.4 (C.D. Cal. 2005). This Court is aware of no authority to the contrary. Cf. Delta Air Lines, Inc.

---

[17] Shulman has moved to strike Dr. Luboshitz's declaration. That motion has been denied. In addition, resolution of the pending motion does not depend on conclusively deciding the issue of Sapir's medical condition or his ability to fly to the United States.

[18] All of Shulman's citations are to trial issues and motions in limine.

v. Chimet, S.p.A., 619 F.3d 288, 299-300 (3d Cir. 2010) (discussed below—court rejects similar argument that defendants seeking forum non conveniens dismissal must submit affidavits identifying the witnesses they would call and the testimony they would provide if the trial were held in the alternative forum); see also id. at 300 (rejecting plaintiff's argument that district court could not refer to defendant's stated desire to pursue third-parties claims against Italian companies on the ground that the statute of limitations for such claims had expired because the threshold "stated desire" is the relevant consideration, not the merits-level analysis of whether such claims could be pursued). Based upon the case law this Court has reviewed, it would appear that Sapir has submitted sufficient evidence to demonstrate that he cannot travel to appear for a trial in this forum (at least not without significant hardship and a possible threat to his health). The Court need not conclusively resolve the question of Sapir's medical condition and ability to travel in order to address the pending threshold motion.

On the other hand, to the extent that the parties believe that this issue can be resolved based upon a battle of declarations from doctors that depend upon credibility determinations, cross-examination of witnesses and conflicting medical reports, they are in error. Furthermore, it would be impractical and inappropriate to convene a hearing and require the doctors to travel to this district to present live testimony on this question, if in fact they could be so compelled. Therefore, the Court can conclude in the alternative that it cannot resolve this issue and proceed to examine the other factors.

Other Witnesses

Sapir lists the following individuals who, he contends, have firsthand knowledge of the nature of his business dealings with Shulman and of the transactions at issue in this matter:

a) Igor Kolomoisky (an Israeli citizen who speaks Russian but not English who Sapir

believes would refuse to travel and/or would be unable to obtain a visa to appear as a witness in this matter) is a business partner of Shulman's who helped form Warren Steel Holdings, LLC, which ultimately purchased the Warren Equipment from Instrad, who Sapir states would supply critical testimony and documents central to his defense that Shulman deliberately inflated the purchase price of the Warren Equipment to defraud his partners, and that he would testify as to what Shulman represented Instrad had paid for the equipment and the actual price at which Shulman (through entities that he controlled) sold the equipment. Sapir avers that Kolomoisky was also involved in an earlier dispute with Boris Bannai regarding ownership of the Warren facility that Plaintiffs have identified as being relevant to this dispute and that he has information relevant to the WIS "secret deal" and the Veolia "secret deal" both of which related to the Warren facility. (Sapir FNC Decl. ¶ 27.)

Shulman responds that Kolomoisky (who resides primarily in Geneva and does not speak Hebrew) has traveled to the United States over the past few years and should have no trouble obtaining a visa and/or would agree to be deposed in this matter. He also states that Kolomoisky has no personal knowledge regarding Sapir's false representations regarding the price Sapir paid for the Warren Equipment or the "secret commission" related to Kisano and Trasteco. (Shulman Decl. ¶ 28(a).) Sapir indicates in his reply brief that, according to the Israeli Ministry of the Interior, Kolomoisky maintains an official residence in Israel and has another residence in Israel where he stays several times a year when visiting Israel. (Sapir Decl. IV ¶ 4 & Ex. 3.) He also observes that Shulman has not produced an affidavit from Kolomoisky stating that he would agree to be deposed in this matter and that Kolomoisky has previously resisted involvement in United States litigation. (Sapir FNC Decl. ¶ 22 & Ex. 3 at 9) (arguing in the West Virginia litigation that "it would impose an unfair and severe burden on Kolomoisky and Shulman to

personally defend claims in a remote forum in a foreign language.")

b) Gennady Bogolyubov (an Israeli citizen who speaks Russian who Sapir believes would refuse to travel and/or would be unable to obtain a visa to appear as a witness in this matter) is the other member of Warren Steel Holdings, who will have information regarding the same general subject matters as Kolomoisky. Sapir also states that Bogolyubov possesses relevant documents. (Sapir FNC Decl. ¶ 28.)

Shulman responds that Bogolyubov (a Ukrainian who resides primarily in London and does not speak Hebrew) has traveled to the United States over the past few years and should have no trouble obtaining a visa and/or would agree to be deposed in this matter. He also contends that Bogolyubov has no personal knowledge regarding Sapir's false representations regarding the price Sapir paid for the Warren Equipment or the "secret commission" related to Kisano and Trasteco. (Shulman Decl. ¶ 28(b).) Sapir indicates in his reply brief that, according to the Israeli Ministry of the Interior, Bogolyubov maintains an official residence in Israel. (Sapir Decl. IV ¶ 5 & Ex. 4.) He also observes that Shulman has not produced an affidavit from Bogolyubov stating that he would agree to be deposed in this matter.

c) Oleg Gignenko (a Ukrainian citizen who speaks Russian and has some knowledge of English who Sapir believes would refuse to travel to the United States to appear as a witness in this matter) is an attorney for Privat Group, the informal grouping of companies controlled by Kolomoisky and Bogolyubov and includes PrivatBank and various industrial concerns, including WSH. Sapir states that Gignenko contacted Shulman and him sometime in 2005 or 2006 regarding the price that he (Sapir) paid for the Warren Equipment; that Gignenko has knowledge of the Warren Equipment deal and the involvement of Instrad in the purchase of the equipment from him; and that Gignenko has documents and information that would support Sapir's position

that he sold the equipment to Instrad.  (Sapir FNC Decl. ¶ 29.)

Shulman states that, to his knowledge, he has never met or spoken to Gignenko. (Shulman Decl. ¶ 30(d).)  In his reply, Sapir asserts that Gignenko contacted him (Sapir) in 2006 on behalf of Warren Steel Holdings and PrivatBank (a group of companies controlled by Kolomoisky and Bogolyubov) and that they corresponded.  (Sapir Decl. IV ¶¶ 30-32 & Exs. 7-8.)

d) Boris Bannai (an Israeli citizen who speaks Hebrew and Georgian, with limited knowledge of Russian, who Sapir believes would refuse to travel to the United States to appear as a witness in this matter) managed the Warren facility and claimed an ownership interest in Warren Steel.  Sapir states that he has knowledge and documents relevant to the price paid for the Warren Equipment, the price that Instrad paid for the Warren Equipment and the price for which the equipment was sold to Warren Steel.  He also notes that Shulman and Kolomoisky, through Warren Steel sued Bannai (and his brother, discussed below) and accused them of fraud and that Plaintiffs have identified that dispute as being relevant to this litigation.  He further states that Bannai attended a meeting with him, Shulman and another person during which the price Sapir paid for the Warren Equipment was discussed; and that he has information related to the Veolia "secret deal."  (Sapir FNC Decl. ¶ 30.)

Shulman responds that he met with Bannai only once or twice and that he does not recall a meeting with Sapir and Bannai at which the price paid for the Warren Equipment was discussed.  (Shulman Decl. ¶ 28(c).)  In his reply brief, Sapir asserts that at a meeting with him, his father and Shulman in Israel, Bannai discussed various issues related to the Warren facility and mentioned that Sapir had paid $6 million for the Warren Equipment.  (Sapir Decl. IV ¶ 21.)

e) David Biniashvili (an Israeli citizen who speaks Hebrew and Georgian and who Sapir

believes would refuse to travel to the United States to appear as a witness in this matter) is Bannai's brother and has information similar to Bannai. (Sapir FNC Decl. ¶ 31.)

Shulman responds that he has never met or spoken with Biniashvili to his knowledge. (Shulman Decl. ¶ 28(d).)

f) Leonid Volf (an Israeli citizen who speaks Hebrew and Russian but not English and who was in jail from 2001 through 2005 and therefore would not be allowed to enter the United States) who was a partner in Instrad and whose testimony, Sapir claims, would rebut Shulman's claim that he used Instrad to purchase the equipment for himself and support Sapir's argument that he sold the Warren Equipment to Instrad and that Shulman lacks standing. (Sapir FNC Decl. ¶ 33.)

Shulman responds that Volf's interests in Instrad ceased before the 2001 Warren Equipment fraud and that he had no interest in Instrad in 2001. (Shulman Decl. ¶ 29(a).) In his reply, Sapir contends that these statements are inconsistent with sworn statements Shulman provided in litigation in Israel concerning Volf. (Sapir Decl. IV ¶¶ 23-24 & Ex. 5.)

g) Simon Exsandler (an Israeli citizen who resides in Ukraine who speaks Russian but not English and who Sapir believes would refuse to travel to the United States to appear as a witness in this matter) was also a partner in Instrad and whose testimony would be similar to Volf's. (Sapir FNC Decl. ¶ 34.) Shulman responds that Exsandler had no interest in Instrad in 2001. (Shulman Decl. ¶ 29(b).) The parties make the same arguments concerning Izchak Radoshkovizh. (Sapir FNC Decl. ¶ 35; Shulman Decl. ¶ 29(c).)

h) Peter Mamo (who lives in Malta and who is outside the subpoena power of the Court) was the sole director and nominee shareholder of Instrad who signed the contract with Sapir for the purchase of the Warren Equipment and can testify as to the nature of that transaction. Sapir

states that Mamo also has information and access to records that would show that Instrad never made all of the $13.5 million in payments for the Warren Equipment; that he can testify that Instrad has been dissolved and "struck off" the corporate list in Malta; that he would have possession of documents relating to Instrad's purchase of the Warren Equipment; and that he would have information related to frauds Sapir alleges Shulman perpetrated against his partners. (Sapir FNC Decl. ¶ 36.)

Shulman responds that Mamo does not speak Hebrew. (Shulman Decl. ¶ 30(a).) In his reply, Sapir provides a letter that Mamo sent to the taxing authorities in Ohio on March 22, 2002 indicating that Instrad (not Shulman) purchased the Warren Equipment in October 2001, which indicates that the deal was completed, contrary to what Shulman claims. (Sapir Decl. IV ¶ 28 & Ex. 6.)

i) Ramon Pace (who lives in Malta and who is outside the subpoena power of the Court) worked with Mamo and would have knowledge similar to his. (Sapir FNC Decl. ¶ 37.) Shulman states that he highly doubts that Pace speaks Hebrew. (Shulman Decl. ¶ 30(b).)

j) Sasha Krasner (an Israeli citizen who is outside the subpoena power of the Court) was Shulman's secretary in Israel in 2001; she received the sales agreement between Sapir and Instrad for the Warren Equipment transaction, did some translation work regarding it, and has knowledge and documents regarding payments relevant thereto. (Sapir FNC Decl. ¶ 38.) Shulman responds that Krasner has agreed to be deposed in Israel in this case. (Shulman Decl. ¶ 8; Temkin Decl. ¶ 10.)

k) Abraham Sapir (Sapir's father, an Israeli citizen who has diabetes and very high blood pressure and has been instructed by his doctors not to travel) introduced Sapir to Shulman and has knowledge concerning the transactions at issue here, including Sapir's purchase of an

apartment for Shulman in Monaco.  (Sapir FNC Decl. ¶ 40.)

Shulman denies that Abraham would have knowledge that would support Sapir's position regarding the "Warren Equipment Fraud" or the "secret commissions," at least based on the conversations Abraham had with Shulman.  (Shulman Decl. ¶ 31(a).)  In response, Abraham has submitted a declaration in which he confirms that he was present on numerous occasions when his son and Shulman discussed and negotiated the deals related to the used steel mill equipment; that he was involved in the negotiations between his son and Shulman regarding the structure of the transaction to purchase the Warren Equipment; that he attended a meeting with his son, Shulman and Bannai in Israel in which they discussed that Sapir had purchased the Warren Equipment for $6.6 million; that he was also involved in discussions regarding the coal deals and had heard Shulman boasting of all the money he had allowed Sapir to earn through commissions; that he attended a meeting with his son, Shulman, Kolomoisky and Bogolyubov in 2005 on Kolomoisky's yacht in Monaco at which Shulman told Kolomoisky that the price for the Warren Equipment had been $18 million and later privately revealed that he had inflated the purchase price and pocketed millions of dollars; that his testimony would support Sapir's position that there were no "secret" deals relating to the Warren Equipment or the coal sales; that he was present at times when his son and Shulman discussed the apartment in Monaco; and that he has firsthand knowledge relating to the agreement between his son and Shulman regarding the purchase and management of real estate in New York City.  (Abraham Sapir Decl. ¶¶ 8-17.)

*l*) Larisa Sapir (Sapir's mother, an Israeli citizen who speaks Russian and Hebrew but not English and who cares for both her husband Abraham and her son Eli, who has cerebral palsy, is completely paralyzed and is confined to a wheelchair) was present at a dinner with Kolomoisky at which the purchase of the Warren Equipment was discussed.  (Sapir FNC Decl. ¶ 42.)

Shulman responds that he has no knowledge what Kolomoisky may have said at a dinner. (Shulman Decl. ¶ 31(c).) Attached to Sapir's reply brief is the declaration of Larisa, who states that Shulman was a frequent guest at her home where he and her son freely discussed their business and that, at the dinner in 2005 or 2006, Kolomoisky mentioned that he and his partners had learned from their American lawyers and Bannai that Sapir had paid $6.6 million for the equipment. (Larisa Sapir Decl. ¶¶ 4-5.)[19]

m) Katia Timofei (an Israeli citizen who speaks Russian and limited Hebrew but no English) works at the Sapir family house and was present when he and Shulman discussed the Warren Equipment and coal deals, including the amounts to be paid. (Sapir FNC Decl. ¶ 44.) Shulman responds that he has no recollection of having business discussion in front of her. (Shulman Decl. ¶ 31(d).)

n) Jacob Ben Yusef (an Israeli citizen who speaks Russian and Hebrew but no English and who Sapir believes would be unwilling to travel to the United States) was present at meetings with Shulman during which the purchase price for the Warren Equipment was discussed. (Sapir FNC Decl. ¶ 45.) Shulman responds that he has no recollection of having business discussion in front of him. (Shulman Decl. ¶ 32(a).)

*o*) Arie Zaidner (an Israeli citizen) has knowledge about the Warren Equipment transaction and was present at certain meetings with Shulman at which the coal deals were discussed. (Sapir FNC Decl. ¶ 46.) Shulman responds that he has no recollection of meeting with Zaidner, or of having business discussion in front of him. (Shulman Decl. ¶ 32(b).)

p) Timuraz Hihinashvili (a Russian businessman who resides in Israel and Moscow) has knowledge about the purchase of the Monaco apartment. (Sapir FNC Decl. ¶ 47.) Shulman

_____

[19] ECF No. 144 Ex. G.

responds that he has no recollection of meeting with Hihinashvili, or of having business discussion in front of him. (Shulman Decl. ¶ 32(c).)

q) Misha Chernoy (an Israeli citizen speaks Russian and Hebrew and who Sapir believes would not travel to the United States) attended a meeting with Shulman during which the Kansas City caster deal and the Warren Equipment deal were discussed. (Sapir FNC Decl. ¶ 48.) Shulman responds that he has met Chernoy, but denies ever having business discussion in front of him. (Shulman Decl. ¶ 32(d).) He also submits that Chernoy is "widely considered to be Russian mafia and wanted by Interpol." (Temkin Decl. ¶¶ 11-14 & Exs. 5-6.)

r) Suta Shabtai (an Israeli businessman who speaks Russian and Hebrew but no English and who Sapir believes would be unwilling to travel to the United States) was present at a meeting at which Shulman disclosed that Sapir made a substantial amount of money selling equipment to one of Shulman's companies. (Sapir FNC Decl. ¶ 49.) Shulman responds that he has no recollection of meeting with Shabtai, or of having business discussion in front of him. (Shulman Decl. ¶ 32(e).)

s) Oleg Syrota (a Ukrainian citizen who speaks Russian) is an attorney for Kisano who has knowledge of the coal deals and was designated to provide testimony under Rule 30(b)(6) in the West Virginia action. (Sapir FNC Decl. ¶ 50.) Shulman responds that Syrota no longer works for companies he controls. (Shulman Decl. ¶ 30(e).)

In addition, Sapir has submitted the declarations of Shmuel Abohazera (ECF No. 119 Ex. C), and Asi Asaf Benyaminov (ECF No. 119 Ex. D), both Israeli citizens, who state that they have knowledge about the Warren Equipment, but who would be unwilling to travel to the United States to testify in this case. Shulman responds that he would never have discussed business in front of these strangers and that their declarations are not truthful. (Shulman Decl.

¶ 27.)  Sapir replies that Shulman is a boastful person who liked to discuss how much money he helped others to make and that these individuals gained knowledge of the Warren Equipment deal, the coal deals or the New York real estate deal from Shulman.  (Sapir Decl. IV ¶¶ 17-20.)

Although the above recitation might appear to present another irresolvable battle of declarations, there is an important distinction between this issue and the issue of Sapir's health: Shulman has no say in the witnesses Sapir can call in his defense.  To accept Shulman's representations that the named individuals have no relevant knowledge would be to allow him to dictate the terms of Sapir's defense.  Moreover, the parties have delved far too deeply into the merits of this case beyond what is necessary or appropriate to resolve a motion to dismiss on the grounds of forum non conveniens.

The Court of Appeals has observed that:

> A party seeking to dismiss an action on forum non conveniens grounds is not required "to describe with specificity the evidence they would not be able to obtain if trial were held in the United States."  Piper Aircraft, 454 U.S. at 258, 102 S.Ct. 252.  The Supreme Court has rejected the suggestion that "defendants seeking *forum non conveniens* dismissal must submit affidavits identifying the witnesses they would call and the testimony these would provide if the trial were held in the alternative forum," explaining that "[s]uch detail is not necessary." Id. Rather, the defendant "must provide enough information to enable the District Court to balance the parties' interests." Id.

Delta Air Lines, Inc. v. Chimet, S.p.A., 619 F.3d 288, 299-300 (3d Cir. 2010).[20]  In this case, Sapir has identified many witnesses and has even submitted affidavits from some of them explaining the testimony they would provide if the trial were held in Israel.  He has unquestionably provided this Court with enough information to balance the parties' interests.

---

[20] In that case, the court held that a domestic plaintiff's choice of forum (Pennsylvania) was outweighed by the private and public factors and dismissed it so that it could be refiled in Italy. In this case, Shulman's choice of this forum is entitled to a low degree of deference for the reasons explained herein.  Thus, this dispute presents an even stronger case for forum non conveniens dismissal.

Sapir states that Shulman's counsel has told his counsel that Kolomoisky and Bogolyubov will not provide information in connection with this American lawsuit, but in Israel he could compel their testimony.  (Sapir Decl. IV ¶ 34.)

It is sufficient that Sapir has named numerous witnesses who he asserts have knowledge crucial to his defense.  Shulman does not deny that these individuals exist or maintain that they are completely unconnected from the incidents at issue; he merely argues that they do not have as much knowledge as Sapir contends.  These individuals live in Israel, Malta, Ukraine and other foreign countries, and none of them supports the convenience of retaining the case in this forum.[21]  On the other hand, they are either willing to testify in Israel or they can be compelled to do so.  (Weinroth Decl. ¶ 35.)

As his witnesses, Shulman identifies the following individuals: Shulman himself, Sapir, Svishchov,[22] Lemster, Andrew Fry (CEO of Winding Gulf, based in West Virginia), Lloyd Williams (CEO of WIS, based in Pennsylvania), Bradley Wolf (an officer of Veolia, based in Pennsylvania), Scott Elliott (an employee of Warren Steel, based in Ohio), Bob Stump (based in Ohio, who has information related to the purchase of assets of CSC by Sapir and Sapir not paying $500,000 to him), Debbie (Lemster's assistant, an employee of SEC), Scott Cessar (an attorney at Eckert Seaman's Pittsburgh office who has information relate to Sapir, the CSC bankruptcy and asset sale, the purchase of CSC assets by Warren Steel and the purchase of CSC assets by Sapir), Peter Baggerman (an attorney at Eckert Seaman's Pittsburgh office who has information related to Sapir, the New York real estate purchase and sale and the persons and entities related thereto), Arthur Korytny (a businessman in New York who managed the New

---

[21] The distance from these locations to Israel is far less than the distance from them to Pittsburgh.
[22] Shulman states in his declaration that George Svischov (he spells the name "Georgiy Svishchev") lives in Ukraine but that he would arrange for Svishchov to be deposed and attend trial in the United States.  (Shulman Decl. ¶ 7.)

York real estate) and Lawrence Drath (an attorney in New York with knowledge of the purchase and sale of the New York real estate). (Temkin Decl. ¶ 9& Ex. 4.)

Sapir responds that: 1) the discussions concerning the coal deal took place in Israel and neither Fry nor anyone else from Winding Gulf was present, he has never visited the offices of Winding Gulf and never met Fry in person, and neither Fry nor anyone else at Winding Gulf ever discussed the commissions that he received with Shulman (Sapir Decl. IV ¶ 12); 2) to the best of his recollection, he has never met with Wolf or Elliott and they would not have knowledge regarding his agreement with Shulman as to the payment of commissions (Sapir Decl. IV ¶ 15); 3) he has never met with Williams in person, although he has spoken with him on the telephone, and Williams never met or spoke with Shulman and would not have knowledge regarding his agreement with Shulman as to the payment of commissions (Sapir Decl. IV ¶ 16); 4) he admits that no money was ever paid to Bob Stump in connection with the purchase of the Warren Equipment so his testimony that he was paid nothing is unnecessary (Sapir Decl. IV ¶ 7); and 5) the New York real estate deal was resolved in a settlement between him and Shulman (which provided that any further disputes arising out of it would be resolved in Israel under Israeli law), and thus Peter Baggerman, Arthur Korytny and Lawrence Drath have no relevant testimony to offer in this case (Sapir Decl. I ¶ 59 & Ex. B ¶ 11).[23]

Shulman contends that, although he is an Israeli citizen, he resides in Monaco and he does not maintain a residence or business address in Israel. (Shulman Decl. ¶ 6.) Sapir admits that Shulman lives in Monaco, but states that he visits Israel frequently (Sapir FNC Decl. ¶ 16) and has cited evidence from the Israeli Ministry of the Interior that Shulman has an official residence in Israel and owns a business there. (Sapir Decl. IV ¶ 3 & Exs. 1-2.) See ECF No. 144

---

[23] ECF No. 66.

Ex. H (March 3, 2010 interview in which Shulman states that he travels with his family to Israel once a month). In any event, Shulman has not argued that he himself would be unable to prosecute his case in Israel or that filing the case there would cause inconvenience to him.

Of course, just as Shulman cannot determine which witnesses Sapir can call for his defense, Sapir cannot determine which witnesses Shulman can call to support his case. Nevertheless, as stated above, it is not necessary that all of the potential witnesses reside in the alternative forum. It is significant that a majority of the proposed witnesses reside in Israel. It is also noted that approximately half of Shulman's proposed witnesses reside outside of Pennsylvania, which does not weigh in favor of retaining the case here. See Windt, 529 F.3d at 194. Furthermore, although making the New York real estate transaction part of this case adds Pennsylvania witness Baggerman and New York witnesses Korytny and Drath, it also introduces the settlement reached in that dispute and the fact that a clause therein directed all further disputes to Israeli courts utilizing Israeli law. These facts support dismissal of the case, not retaining it in this forum.

Shulman argues that there are 18,700 pages of documents in this case and that almost all of them are in English and would have to be translated into Hebrew, at considerable expense. (Temkin Decl. ¶¶ 2-5 & Exs. 1-3.) Sapir responds that Shulman cites no authority for the statement that the documents would have to be translated.[24] On the contrary, Israeli lawyer Jacob Weinroth has stated that documents used as evidence in civil court proceedings usually need not be translated from English into Hebrew and that testimony from English-speaking witnesses usually may be taken in English without need of translation because almost all Israeli

---

[24] Maria Temkin, who makes this assertion, states that she is an attorney at Marks & Sokolov (Temkin Decl. ¶ 1) but does not indicate that she is familiar with Israeli law or court practices. Shulman also makes this assertion (Shulman Decl. ¶ 25), but similarly provides no basis for how he would know this to be true.

judges speak and write English and all sophisticated law firms have English-speaking lawyers. "If a case like this one, which involves sophisticated international business people, were to proceed in Israel, the court would most probably accept documents and testimony in English." In addition, he states that, if the documents had to be translated into Hebrew and Shulman prevailed, he could recover the translation costs as an expense awarded to a prevailing party. (Weinroth Decl. ¶ 37; Weinroth Decl. II ¶¶ 2, 7.) See also Eurofins, 623 F.3d at 163 ("The mere fact that certain documents are written in English is insufficient to change" the conclusion that France had a more significant interest in resolving the dispute).

The Court concludes that the private factors of access to evidence and availability of witnesses weigh in favor of dismissal.

Evaluation of Public Factors

The public factors to be evaluated include:

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Eurofins, 623 F.3d at 162 (citing Piper Aircraft, 454 U.S. at 241 n.6). In Eurofins, the court found that public interest factors weighed in favor of dismissal because the litigation focused "on French defendants' alleged breaches of contract and fiduciary duties, which took place in France, and therefore France has a more significant interest in resolving the dispute than Delaware." Id. Further, litigation in France would avoid the possibility of "incongruous results" when related litigation was already pending there. Id.[25] Similarly, in Windt, the court concluded that the

---

[25] In Eurofins, the public and private factors outweighed the choice of forum in Delaware made by Delaware and Iowa corporations. In this case, the choice of this forum by a foreign citizen is

Netherlands had a greater interest in adjudicating a dispute involving allegations of fraud and mismanagement of a Dutch business entity than New Jersey did, even when two of the defendants were domiciled in New Jersey, and four board meetings and five international conference calls took place somewhere in the United States.  529 F.3d at 192-93.

Sapir contends that the focus of the public interest analysis is the "locus of the alleged culpable conduct" and the connection of that conduct to the chosen forum.  Eurofins, 623 F.3d at 162.  Where there is little or no local connection to the case, dismissal is appropriate.  Windt, 529 F.3d at 193.  He also argues that Israel has a significant interest in adjudicating a business dispute between two Israeli citizens and that the possibility of incongruous results would be eliminated by filing this case in Israel, where litigation between him and Shulman is already pending.  See Weinroth Decl. ¶ 24 (noting that Sapir has filed suit against Shulman in Israel that includes some of the same issues as the dispute in this Court and stating that Israeli law has a procedure for joining related cases).

Shulman cites a variety of events, but few of them have any connection to Pennsylvania.  The Warren Equipment was located in Ohio, the New York real estate obviously is in New York and another case involving Shulman is pending in West Virginia.  None of these items implicate Pennsylvania in this dispute.  Sapir previously stated that: he first met Shulman in Israel; the second time they met in Israel they discussed purchasing steel mill equipment; that they discussed the coke deals in Israel; and most of his interactions with Shulman "have taken place in person in Israel, Monaco or Ukraine or by telephone with one or both of us in Israel, Monaco or Ukraine.  To the extent that we reached agreements, those agreements were negotiated and concluded in Israel."  (Sapir Decl. I ¶¶ 8-10, 38, 42, 45-46, 66.)  Shulman does not contend

---

entitled to a low degree of deference for the reasons explained herein.  Thus, this dispute presents an even stronger case for forum non conveniens dismissal.

otherwise.

As noted above, Shulman cites a few events with a Pennsylvania connection, specifically two faxes and a bill of sale allegedly being sent by Sapir from Pennsylvania and two of the $908,000 payments for financing the Warren Equipment being wired to SEC's bank account in Pennsylvania. However, it cannot be said that the locus of the alleged culpable conduct occurred in Pennsylvania.

Shulman also contends that United States law (for the RICO claims) and Pennsylvania law (for the others) would govern. Sapir, on the other hand, states that:

> Because Shulman and I are both Israeli citizens and because most of our discussions regarding the deals at issue took place in Israel (although a few took place with one or both of us in Monaco or Ukraine), I believed that any disputes that we might have regarding our business would be resolved in Israel. We certainly never discussed resolving any litigation in Pennsylvania or the application of Pennsylvania law to such a dispute.

> The one time that Shulman and I did discuss choice of law was during the negotiation of the New York Real Estate Settlement Agreement. Shulman and his lawyer proposed that we resolve any disputes regarding the real estate located in New York City or the settlement in Israel. I agreed that Israel was the natural forum for a dispute between us.

(Shulman Decl. IV ¶¶ 55-56.)

Sapir has provided a copy of the Settlement Agreement for the New York real estate dispute, which does indeed contain a clause stating that all disputes arising out of it shall be heard in Israeli courts under Israeli law. (Sapir Decl. I ¶ 59 & Ex. B ¶ 11.) Beyond that, the Court cannot resolve the issue of what law should apply to the claims herein. However, the Court of Appeals has held that, "in resolving a forum non conveniens motion, the district court is not required to predict what law the foreign court would apply." Lacey, 932 F.2d at 187 n.14. Therefore, the Court need not resolve this issue.

Finally, Shulman argues that: 1) Sapir has not demonstrated that there is "court

congestion" in this forum; 2) the factor of having the United States protecting its own citizens (to which Shulman is made equivalent pursuant to the treaty between Israel and the United States) weighs in favor of retaining the case; 3) a United States jury would have a strong interest in protecting Shulman for the same reason; and 4) this Court and the parties have invested substantial resources in this case.

Sapir responds that: 1) he does not need to address each and every possible public factor; 2) and 3) Shulman cites not authority in support of his argument that he should be considered the equivalent of a United States citizen for purposes of these factors (even the Blanco case was only discussing the amount of deference due to a foreign plaintiff because of a treaty) ; and 4) this case has not "proceeded substantially" because no extensive merits discovery has occurred, the original parties engaged in limited written discovery and no depositions have occurred; in addition, he notes that Shulman consented to an order providing that document production "shall be without prejudice to Sapir's pending motion to dismiss on the ground of forum non conveniens" and thus he is precluded from arguing that the case has "proceeded substantially."

The Court concludes that Sapir's arguments are meritorious. The Court has already concluded that Blanco does not apply in the Third Circuit and that Shulman's forum choice receives reduced deference because he is a foreign plaintiff; a fortiori, he does not receive the benefit of public factors that weigh in favor of United States citizens. With respect to the argument that this case has "proceeded substantially," the undersigned recently observed that no progress in this case is apparent.

The Court concludes that the public factors weigh in favor of dismissal. In sum, Israel is an adequate alternative forum, Shulman's choice of this forum is entitled to a low degree of deference because he is a foreign plaintiff and a balancing of the private and public factors favors

dismissal of this case, which primarily concerns foreign parties and bears very little connection to this forum.

For these reasons, it is recommended that the motion to dismiss on the grounds of forum non conveniens (ECF No. 115) filed on behalf of defendant Akiva Sapir, be granted.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections within the time specified in the Notice of Electronic Filing. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: December 17, 2012